UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
TAWANA SCOTT, individually and as
Administratrix of the Estate of
KEVIN TURNER

                      Plaintiff,

                                          <u>MEMORANDUM & ORDER</u>

      -against-                   12-CV-0909(JS)(SIL)

COUNTY OF SUFFOLK; SUFFOLK COUNTY
POLICE DEPARTMENT; SUFFOLK COUNTY
POLICE OFFICERS JASON LaROSA and
KENNETH HAMILTON; POLICE OFFICERS
JOHN DOE 1-10; BROOKHAVEN MEMORIAL
HOSPITAL; MARGARET L. MACLEOD,
M.D.; and JOHN DOE, M.D. ("John Doe,
M.D." representing as yet an unknown
and unidentified physician),

                     Defendants.
----------------------------------X

APPEARANCES
For Plaintiff:              John C. Bennett, Esq.
                       Gathman & Bennett, LLP
                       191 New York Avenue, Second Floor
                       Huntington, New York  11743

For Defendant
County of Suffolk:        Brian C. Mitchell, Esq.
                       Assistant County Attorney
                       Suffolk County Department of Law
                       H. Lee Dennison Building
                       100 Veterans Memorial Highway
                       P.O. Box 6100
                       Hauppauge, New York  11788

For Defendant
Jason LaRosa:             William Patrick Nolan, Esq.
                       1103 Stewart Avenue, Suite 200
                       Garden City, New York  11530

For Defendant
Kenneth Hamilton:        Joseph R. Conway, Esq.
                       LaRusso & Conway
                       300 Old Country Road, Suite 341

                                    Mineola, New York  11501

For Defendants
Brookhaven Memorial
Hospital & Margaret
L. MacLeod:              Lorraine Berlund Polin, Esq.
                         Anthony M. Maffia, Esq.
                         Fumuso, Kelly, Swart, Farrell, Polin
                         & Christesen, LLP
                         110 Marcus Boulevard
                         Hauppage, New York  11788

SEYBERT, District Judge:

        Tawana Scott initiated this action as the administratrix of the estate of her deceased son, Kevin Turner, alleging federal and state law claims arising out of an altercation between Turner and County of Suffolk police officers that led to Turner's hospitalization and untimely demise.  For the following reasons, Defendants' respective motions for summary judgment are GRANTED IN PART and DENIED IN PART and Plaintiff's cross-motions for summary judgment are DENIED.

                          FACTUAL BACKGROUND

I.   Materials Before the Court

        The Court has reviewed the following briefs in support of the parties' motions and cross-motions for summary judgment: (1) Officer Hamilton Support Memo, ECF No. 99; (2) Plaintiff's Opposition ("Pl. Opp'n") to Officer Hamilton, ECF No. 114; (3) Officer Hamilton Reply, ECF No. 122; (4) Officer LaRosa Support Memo, ECF No. 101-2; (5) Pl. Opp'n to Officer LaRosa, ECF No. 116; (6) Officer LaRosa Reply, ECF No. 123; (7) County Support

Memo, ECF No. 105; (8) Pl. Opp'n to County, ECF No. 111; (9) County Reply, ECF No. 126; (10) Hospital Defendants ("Hosp. Defs.") Support Memo, ECF No. 103-1; (11) Pl. Opp'n Hosp. Defs., ECF No. 118; (12) Hosp. Defs. Reply, ECF No. 125.

Further, unless otherwise indicated, the factual summary has been taken from the following materials submitted in connection with Defendants' respective motions for summary judgment: (1) Officer Hamilton's Rule 56.1 Statement (Officer Hamilton 56.1 Stmt., ECF No. 99-1); (2) Plaintiff's Rule 56.1 Counterstatement in Response to Officer Hamilton's Rule 56.1 Statement (Pl. 56.1 Counterstmt. to Officer Hamilton, ECF No. 113); (3) Officer LaRosa's Rule 56.1 Statement (Officer LaRosa 56.1 Stmt., ECF No. 101-3); (4) Plaintiff's Rule 56.1 Counterstatement in Response to Officer LaRosa's Rule 56.1 Statement (Pl. 56.1 Counterstmt. to Officer LaRosa, ECF No. 115); (5) Suffolk County's Rule 56.1 Statement (County 56.1 Stmt., ECF No. 104-2); (6) Plaintiff's Rule 56.1 Counterstatement to the County's Rule 56.1 Statement (Pl. 56.1 Counterstmt. to County, ECF No. 108); (7) Hospital Defendants' Rule 56.1 Statement (Hosp. Defs. 56.1 Stmt., ECF No. 103-2); and (8) Plaintiff's Rule 56.1 Counterstatement to the Hospital Defendants (Pl. 56.1 Counterstmt. to Hosp. Defs., ECF No. 103-46). Further, unless otherwise stated, a standalone citation to a Rule 56.1 Statement or Counterstatement denotes that either the parties agree or the Court has determined that the underlying

factual allegation is undisputed. Citation to a party's Rule 56.1 Statement or Counterstatement incorporates by reference the document(s) cited therein.

Officer Hamilton's exhibits, which are attached to the Declaration of Joseph R. Conway (see ECF No. 99-2), are identified by letters. The County's exhibits, which are attached to the Declaration of Brian C. Mitchell (see ECF No. 104-1), are identified by letters. The Hospital Defendants' exhibits, which are attached to the Declaration of Anthony M. Maffia (see ECF No. 103-3), are identified by numbers. Plaintiff's exhibits, which are attached to the Bennet Declaration and span several docket entries (see ECF Nos. 109-112), are identified by letters.

## II.  The Parties

Plaintiff Tawana Scott ("Plaintiff") is the mother of decedent Kevin DeShaun Turner ("Turner"). She initiated this action on his behalf as the administratrix of his estate.

During the relevant period Defendants Jason LaRosa ("Officer LaRosa") and Kenneth Hamilton ("Officer Hamilton," and together with Officer LaRosa, the "Officer Defendants") were employed by the Suffolk County Police Department, an administrative arm of Defendant County of Suffolk (the "County"). The Officer Defendants were stationed at the County Police Department's Fifth Precinct, located in Patchogue, New York.

Defendant Brookhaven Memorial Hospital Medical Center, Inc. ("Brookhaven Hospital") is a hospital located in Patchogue, New York, and Defendant Margaret L. MacLeod, M.D. ("Dr. MacLeod," and together with Brookhaven Hospital, the "Hospital Defendants") was an employee there during the relevant period. Plaintiff also names John and Jane Doe Defendants.

III. <u>The April 6, 2010 Altercation</u>

In the early morning hours of April 6, 2010, Officer LaRosa and his partner Michael Richardsen ("Officer Richardsen") were on patrol in North Bellport, Bellport, and East Patchogue. (Officer LaRosa 56.1 Stmt. ¶ 3.) While on patrol, Officers LaRosa and Richardsen observed a black Kia SUV swerving, travelling at a high rate of speed, and failing to stop at a stop sign. (<u>Id.</u> ¶ 4.) The officers pulled over the vehicle, exited their patrol car, and approached the vehicle, at which point it drove off at a high rate of speed. (<u>Id.</u> ¶ 5.) Officers LaRosa and Richardsen gave chase. (<u>Id.</u>) At the same time, Officer Hamilton, who was patrolling solo in a nearby unit, overheard a call on his radio that indicated a vehicle suspected of driving while intoxicated was being pursued and joined the chase. (<u>Id.</u> ¶ 6; Officer Hamilton 56.1 Stmt. ¶ 6.) The parties dispute who hit whom, but they agree that a collision ensued, forcing the Kia's driver, Turner, to exit

the vehicle and flee on foot.  (Officer LaRosa 56.1 Stmt. ¶¶ 7-9; Officer Hamilton 56.1 Stmt. ¶¶ 7-9.)[1]

Officers LaRosa and Hamilton pursued Turner by foot through a residential neighborhood.  (Officer LaRosa 56.1 Stmt. ¶¶ 9-10; Officer Hamilton 56.1 Stmt. ¶¶ 9-10.)[2]  According to the supplementary report filed by Officer Hamilton the day of the incident, and consistent with his deposition testimony, during the foot pursuit, Officer Hamilton stated that he saw Turner holding a silver metallic object in his waistband and proceeded to transmit that fact over the radio to warn other officers; however, he did not know whether it was a knife, a gun, or some other object. (Officer Hamilton 56.1 Stmt. ¶ 11; Officer Hamilton Supp. Report, Ex. F, <u>attached to</u> Conway Decl.)  Officer LaRosa's supplementary report, filed the day of the incident, is likewise consistent with his subsequent deposition testimony wherein he stated that he observed Turner holding his waistband during the chase.  (LaRosa 56.1 Stmt. ¶ 11; Officer LaRosa Supp. Report, Ex. J <u>attached to</u> Conway Decl.)  Plaintiff disputes the Officers Defendants' claims,

---

[1] Turner's friend, Leo Mann, was driving with Turner on the night of the incident.  (Mann Statement, Ex. OO, <u>attached to</u> Conway Decl.)  According to Mann's statement to the County Police Department, he fled in a separate direction from Turner after the collision and did not see Turner afterwards.  (<u>Id.</u> at 2.)

[2] It appears Officer Richardsen did not join the foot pursuit because he was pinned in the car.  (Hamilton Depo. Tr. at 23:14-16, Ex. E, <u>attached to</u> Conway Decl.)

noting Officer LaRosa "never observed any knife" and that it was dark during the chase.  (E.g., Pl. 56.1 Counterstmt. to Officer LaRosa ¶ 11.)

At some point, Officer LaRosa lost sight of Turner; however, Officer Hamilton discovered Turner in a residential yard standing next to a tree, a few feet into the wood line below a chain link fence about four feet high.  (Officer LaRosa 56.1 Stmt. ¶ 12; Officer Hamilton 56.1 Stmt. ¶ 12.)   Officer Hamilton recognized Turner from pictures in recent "wants" for Turner that were based on his alleged role as the assailant in a recent stabbing.  (Officer Hamilton Depo. Tr. at 49-55, Ex. E, attached to Conway Decl.; Officer Hamilton Supp. Report; Officer Hamilton 56.1 Stmt. ¶ 14.)  Officer Hamilton reported that he shined his flashlight on Turner and observed him screaming unintelligibly.  (Officer Hamilton 56.1 Stmt. ¶ 13.)   He further reported that Turner turned towards him holding his right hand down behind his right hip.  (Id.)  Turner responded to Officer Hamilton's repeated commands to show his hands with "loud growling noises" and incoherent yelling.  (Officer Hamilton Supp. Report.)  According to Officer Hamilton, Turner then stepped towards him and pulled a silver knife with a five-inch blade from the right side of his waistband.  (Officer Hamilton Supp. Report; Officer Hamilton 56.1 Stmt. ¶ 15.)  In response, Officer Hamilton drew his handgun and ordered Turner to drop the knife.  (Officer Hamilton 56.1 Stmt. ¶

15.)   After   initially   disregarding   Officer   Hamilton's   order, Turner eventually dropped the knife.  (Id.)

Officer LaRosa heard Officer Hamilton issuing commands to Turner and located the pair as Officer Hamilton was trying to place Turner under arrest after Turner dropped the knife.  (Officer LaRosa 56.1 Stmt. ¶¶ 16-18.)   Officer LaRosa testified that as he approached,   he   observed   Turner   lunge   at   Officer   Hamilton   and attempt to strike him in the face.  (Id. ¶ 18.)   Officer Hamilton similarly testified that Turner punched him in the head after he had holstered his handgun and reached to grab Turner to place him into custody.  (Officer Hamilton 56.1 Stmt. ¶ 19.)

A   violent   altercation   ensued.   (Officer   LaRosa   56.1 Stmt. ¶ 21; Officer Hamilton 56.1 Stmt. ¶ 21.)   According to the Officer Defendants, Turner was kicking, elbowing, kneeing, and scratching them during the fight.   As a result, the Officer Defendants struck Turner in the head and body with their fists, Officer LaRosa deployed his asp to Turner's legs, and Officer Hamilton struck Turner in the head with his flashlight.  (Compare Officer Hamilton Depo. at 77:18 (admitting he struck Turner with his flashlight), and Serology Report, Ex. DD, attached to Bennett Decl.   (noting   possible   trace   blood   on   Officer   Hamilton's flashlight); with Officer Hamilton 56.1 Stmt. ¶ 25 ("Officer Hamilton   did   not   strike   Turner   with   any   object," and "Officer LaRosa did not see Officer Hamilton hit Turner with anything other

than his fist.").)  Officer Hamilton testified that at some point during the altercation he attempted to deploy his pepper spray but misdirected it towards Officer LaRosa and the ground.  (Officer Hamilton 56.1 Stmt. ¶ 26.)[3]  The Officer Defendants testified that Turner attempted to reach for Officer LaRosa's holstered weapon at least once during the altercation.  (Officer LaRosa 56.1 Stmt. ¶ 22; Officer Hamilton 56.1 Stmt. ¶ 22.)  As a result, the Officer Defendants considered the fight to be a life-or-death struggle. (Officer LaRosa 56.1 Stmt. ¶ 23; Officer Hamilton 56.1 Stmt. ¶ 23.)  Eventually, the officers succeeded in subduing and handcuffing Turner.  (Officer LaRosa 56.1 Stmt. ¶ 27; Officer Hamilton 56.1 Stmt. ¶ 27.)  At that point, Officer LaRosa left Officer Hamilton with Turner to determine their location and radio for help.  (Officer LaRosa Depo. Tr. at 85-86, 88-89, Ex. C, attached to Conway Decl.)  Officer LaRosa left Officer Hamilton with Turner a second time to flag down the responding officers. (Id.)

As other officers arrived on the scene, Officer Hamilton instructed them to search for a knife where Turner had been standing.  (Officer Hamilton 56.1 Stmt. ¶ 28.)  The responding officers, including Officers Kevin Middleton ("Officer

---

[3] Officer LaRosa also testified that he used pepper spray during the altercation, although this fact is not addressed in the Officer Defendants' respective 56.1 Statements.  (Officer LaRosa Depo. Tr. at 87-88, Ex. C, attached to Conway Decl.)

Middleton"), Michael Cassidy ("Officer Cassidy"), and Frank Munsch ("Officer Munsch") performed an evidence search with the assistance of a K-9 unit.  (Id. ¶ 35.)  "Within seconds of starting the search," the responding officers recovered a knife.  (Id. (citing Ex. N, attached to Conway Decl.).)  At some point the knife was handed to Officer Munsch, who placed it in his pocket.  (Id.; Officer Munsch Supp. Report, Ex. O, attached to Conway Decl.)  He later handed the knife to Officer Richardsen who then improperly treated the knife as prisoner property rather than evidence.  (See Officer Munsch Supp. Report; Officer Hamilton 56.1 Stmt. ¶¶ 36-37.)  Specifically, Officer Richardsen placed the knife on the hood of his police vehicle and finished processing the crime scene. (Officer Hamilton 56.1 Stmt. ¶¶ 36-37.)  According to Officer Richardsen, the knife fell off the hood of his vehicle when he drove away; it was never recovered.  (Officer Hamilton 56.1 Stmt. ¶ 37 (citing Detective Chase Supp. Report, Ex. P, attached to Conway Decl.).)

Plaintiff generally disputes Turner's conduct during the night of the altercation on the grounds that he is no longer alive to controvert the Officers Defendants' narrative.  In addition, Plaintiff disputes that Turner had a knife the night of the incident, "whether a knife had been found at the scene, who the knife belonged to, and whether the knife was inadvertently lost." (Pl. 56.1 Counterstmt. to Officer Hamilton ¶ 36.)

Turner was charged with menacing, resisting arrest, reckless endangerment, fleeing police in a motor vehicle, as well as various motor vehicle infractions. (Officer Hamilton 56.1 Stmt. ¶ 32 (citing Misdemeanor Information, Ex. G, underline attached to Conway Decl.).)

Officer Hamilton was transported by ambulance to Stony Brook University Hospital where he received treatment for head, neck, and back injuries. (Id. ¶¶ 30-31.) Officer Hamilton was unsure whether his head and neck pain were the result of the vehicle crash or his struggle with Turner. (IAB Case Report at 3, Ex. I, attached to Conway Decl.) Officer Hamilton was diagnosed with a back strain and a head contusion. (Id.) For his part, Officer LaRosa was treated at Stony Brook University Hospital for a right shoulder strain. (Officer LaRosa 56.1 Stmt. ¶ 32; IAB Case Report at 3.) Photographs of Officers Hamilton and LaRosa taken the night of the incident are not inconsistent with these internal injuries, though they show that the officers did not have any scratches or bruises on their hands or face. (See Photographs, Ex. T, attached to Bennett Decl.) Officer Hamilton's left pantleg is ripped, however. (Id.)

As reported by multiple officers involved in securing the scene and transporting Turner to Brookhaven Hospital, Turner remained combative and uncooperative with hospital staff, necessitating leg restraints and a paper mask to prevent him from

spitting blood.   (Officer Hamilton 56.1 Stmt. ¶¶ 33-34 (citing Exs. K, L, M, attached to Conway Decl.)   Turner's injuries and subsequent demise are detailed in the following section.

In a June 24, 2016 County Internal Affairs Bureau ("IAB") report on the incident, Lieutenant Michael N. Pirone ("Lt. Pirone"), who completed the internal affairs investigation of the incident and drafted the report, concluded that no disciplinary action should be taken against Officers Hamilton and LaRosa.  (IAB Case Report; Officer LaRosa 56.1 Stmt. ¶¶ 39-40; Officer Hamilton 56.1 Stmt. ¶¶ 39-40.)   Lt. Pirone exonerated Officer Hamilton of the false arrest complaint regarding Turner's resisting arrest. (IAB Case Report at 22-23.)   He further concluded that the excessive force complaints levelled against Officers Hamilton and LaRosa were unsubstantiated.  (Id. at 20-21.)   However, Lt. Pirone substantiated the complaint of improper police action as to Officer Richardsen with respect to his failure to safeguard the knife allegedly recovered at the crime scene.  (Id. at 21-22.)

IV.   Turner's Treatment at Brookhaven Hospital

An ambulance arrived on the scene of Turner's arrest at 12:42 a.m.  (Hosp. Defs. 56.1 Stmt. ¶ 1.)  Because Turner remained extremely combative and non-compliant, ambulance personnel were unable to properly assess him.  (Id. ¶¶ 1-2.)  At 12:59 a.m., Turner arrived at Brookhaven Hospital via ambulance.  (Id. ¶ 4.)

Around 1:00 a.m., Dr. MacLeod, a physician who has been licensed to practice medicine in the State of New York since 1988, examined Turner. (Id. ¶ 5.) To assess Turner, Dr. MacLeod used a three-page document, the "Brookhaven Memorial Hospital Medical Center Emergency Physician Record - Alleged Assault" (the "Emergency Physician Record"), which was used by Brookhaven Hospital personnel at the time to assess patients who presented to the emergency room as victims of alleged assaults. (Id. ¶¶ 11-13; see also Emergency Physician Record, Ex. 7.)

Dr. MacLeod filled out the Emergency Physician Record and performed a physical examination of Turner "in order to determine what needed to be done for [Turner], to determine what tests needed to be performed and to determine the plan for [Turner]." (Hosp. Defs. 56.1 Stmt. ¶¶ 21-28.) Dr. MacLeod found and noted on the Emergency Physician Record that Turner "was in no acute distress, alert and had evidence of trauma"; she further indicated that Turner had a laceration on his left cheek, as well as swelling and tenderness, and trauma to his face. (Id. ¶¶ 29-33.) Dr. MacLeod further examined Turner's eyes, abdomen, neurological and psychological condition, skin, back, pelvis, hip, and extremities, including his feet and ankles. (Id. ¶¶ 34-48.) She documented her findings on the Emergency Physician Record. (Id. ¶ 49.)

Following Dr. MacLeod's assessment, at 1:12 a.m., she ordered immediate CT scans[4] of Turner's head, face, and cervical spine, because "she was concerned that [Turner] had a head injury due to the fact that [he] had swelling and tenderness of his face and that there was a complaint of an alleged assault." (Id. ¶¶ 50-52.)  She also ordered blood tests, a urinalysis, alcohol test, type and screen blood test, and a portable x-ray.  (Id. ¶ 53.)  Given Turner's continued combativeness, for the safety of the staff and so Turner could undergo the CT scan, Dr. MacLeod ordered sedatives be administered to Turner.  (Id. ¶¶ 55-58.)[5]

At about 1:01 a.m., Nurse Leo Matutino ("Nurse Matutino") assessed Turner.  (Id. ¶ 59.)[6]  To facilitate his examination, Nurse Matutino filled out the "Emergency Department

---

[4] A CT scan, or computerized tomography scan, "combines a series of X-ray images taken from different angles around your body and uses computer processing to create cross-sectional images (slices) of the bones, blood vessels and soft tissues inside your body. CT scan images provide more-detailed information than plain X-rays do."  CT Scan, MAYO CLINIC, https://www.mayoclinic.org/tests-procedures/ct-scan/about/pac-20393675. (last visited Mar. 22, 2022).

[5] Plaintiff disputes that the sedatives were necessary to ensure Turner's and staff's safety, as the Hospital Defendants assert. (Pl. 56.1 Counterstmt. to Hosp. Defs. ¶¶ 55-56.)  To the contrary, Plaintiff claims that the sedatives were contraindicated in the face of potential brain injury.

[6] It is not clear from the Hospital Defendants' 56.1 Statement or supporting documentation whether Nurse Matutino's examination occurred after Dr. MacLeod's or whether they examined Turner around the same time.

Nursing Assessment" document, which Brookhaven Hospital regularly used at that time to treat patients who presented to the emergency room.    (Id. ¶¶ 62-63; see also Emergency Department Nursing Assessment, Ex. 8.)    Nurse Matutino performed a neurological assessment that found Turner to be alert, combative, restless, and agitated.    (Hospital Defs. 56.1 ¶¶ 68-69.)    He further evaluated Turner's motor coordination and cardiac status, and checked Turner's lung sounds, pulse, and eyes, recording his findings on the Emergency Department Nursing Assessment.    (Id. ¶¶ 70-71.) Nurse Matutino observed Turner had left facial swelling and lacerations on his face and upper lip.    (Id. ¶¶ 72, 78.)    Nurse Matutino's assessment found Turner's abdomen was non-tender.    (Id. ¶ 73.)    He further observed that Turner was voiding amber urine; to confirm Turner had blood in his urine, he used a urine drip. (Id. ¶¶ 76-77.)

At 1:15 a.m., Nurse Matutino took Turner's vital signs. (Id. ¶ 83.)    At 1:21 a.m., Turner's blood work came back, with the toxicology report indicating Turner was positive for phencyclidine ("PCP") and THC.    (Id. ¶¶ 81-82.)    At 1:25 a.m., a portable x-ray taken of Turner's chest returned "normal" results.    (Id. ¶ 84.)

At 1:35 a.m. Nurse Matutino took Turner to the CT scan. (Id. ¶ 87.)    Nurse Matutino's notes from after Turner's return from the CT scan reflect that Turner "was to be closely monitored."

15

(Id. ¶ 88.)  Consistent with that direction, Nurse Matutino took and recorded Turner's vitals again at 1:45 a.m.  (Id. ¶ 89.)

Around 1:50 a.m., Dr. MacLeod received the preliminary results from Turner's CT scan.  (Id. ¶¶ 90-93.)  The preliminary results revealed a "subdural hematoma with right shift."  (Id.) The final report confirmed this finding and further indicated Turner suffered from a "right nasal bone fracture."  (Id. ¶ 95.) Due to these findings, Dr. MacLeod instructed the unit secretary to call Brookhaven Hospital's Emergency Department on-call neurosurgeon, Dr. Sheth.  (Id. ¶¶ 96-97.)  By 1:55 a.m., Dr. MacLeod discussed Turner's condition with Dr. Sheth, who advised Dr. MacLeod that he could not come to Brookhaven Hospital for an evaluation of Turner.  (Id. ¶¶ 99-102.)  As a result, Dr. MacLeod requested a transfer to Stony Brook University Hospital, because she "wanted [Turner] to be evaluated by Neurosurgery due to the fact that a patient with a subdural hematoma needs a neurosurgical evaluation."  (Id. ¶¶ 101, 106.)

At 2:05 a.m., Dr. MacLeod called Stony Brook University Hospital for a transfer, which was accepted at 2:20 a.m.  (Id. ¶¶ 107-09, 112-13.)  Prior to transfer, Dr. MacLeod filled out a two-page "Authorization for Transfer" sheet.  (Id. ¶ 116; see also Authorization for Transfer, Ex. 17.)  Dr. MacLeod indicated on the Authorization for Transfer sheet that Turner's condition "was stable for transfer," specifying that Turner "has been stabilized

16

such that, within reasonable medical probability, no material deterioration of [his] condition is likely to result from transfer to another medical facility." (Hosp. Defs. 56.1 Stmt. ¶ 120-21; but see Pl. 56.1 Counterstmt. to Hosp. Defs. ¶¶ 120-122, 135 (disputing that Plaintiff was neurologically stable at the time of transfer).) As Dr. MacLeod clarified at her deposition, however, when she indicated Turner's condition was stable for transfer, she was not referring to his subdural hematoma condition, which she could not stabilize; "[t]hat would be the neurosurgeon's responsibility." (MacLeod Depo. Tr. at 230-34, Ex. 6.)

Nurse Matutino and Dr. MacLeod continued to monitor Turner while he awaited transfer at Brookhaven Hospital. (See Hosp. Defs. 56.1 Stmt. ¶¶ 124-25, 127-30.) Prior to transfer, Dr. MacLeod prescribed and administered Tetanus and Ancef to Turner (id. ¶ 116); Nurse Matutino examined Turner's eyes and took his vitals (id. ¶ 124); and Dr. MacLeod examined Turner's breathing and reviewed a subsequent x-ray to determine Turner's lungs had not collapsed (id. ¶ 129). At 3:20 a.m., the Stony Brook University Hospital Transport Team arrived and discussed administering Mannitol to Turner with Stony Brook University Hospital's neurosurgeon, Dr. Galler. (Id. ¶ 126.)[7] Turner was then intubated for transfer. (Id. ¶ 128.) At 3:45 a.m., Nurse

---

[7] It is unclear whether Mannitol was actually administered to Turner.

Matutino provided staff at Stony Brook University Hospital with a report on Turner's status and all of the emergency room documentation.  (Id. ¶¶ 131-32.)

At 4:00 a.m., Turner was transferred to Stony Brook University Hospital.  (Id. ¶ 133.)  According to records from the Transport Team, Turner "remained without change throughout [the] transport," with "[n]o change in [his] neuro status."  (Id. ¶ 136.) At 4:33 a.m., Turner presented to the Emergency Department at Stony Brook University Hospital, and at 4:44 a.m., a CT scan was ordered. (Id. ¶¶ 137-38.)  By 5:37 a.m., Stony Brook University Hospital staff began to administer anesthesia for the surgery to evacuate Turner's subdural hematoma.  (Id. ¶ 139.)

In his operative report, Dr. Galler, who operated on Turner, summarized Turner's clinical history as follows:

> This is an identified male who was apparently subdued by police after an extended car chase and MVA, taken to Brookhaven Hospital where he was Glasgow coma score 15 and combative.  A neurosurgical consult was requested after CAT scan revealed subdural hematoma. Unfortunately, there was no neurosurgeon available.  There was a neurosurgeon on call who did not respond appropriately as he was on call at another institution, which violates traditional call scheduling and EMTALA.  They did not call for additional neurosurgical coverage at that hospital.  Therefore, the patient stayed in that hospital inordinately long without neurosurgical care.  When finally there was no neurosurgeon at Brookhaven Hospital available, and the ER required treatment, they called Stony Brook University Hospital where he was immediately transferred,

> rescanned, and taken to the operating room
> within 15 minutes as a level 1 trauma, level
> A, for craniotomy and evacuation of subdural
> hematoma. By the time he reached Stony Brook
> he was fixed and dilated with herniation
> syndrome, posturing. Given the extremis of
> his condition and the rapid deterioration, he
> was taken to OR for craniotomy, craniectomy,
> evacuation of hematoma.

(Galler Report at 1, Ex. 23.)

Turner underwent various post-operative procedures at Stony Brook University Hospital from the night of the incident through April 2010. On April 28, 2010, Turner was discharged to St. Charles Hospital Rehabilitation and thereafter John J. Foley Skilled Nursing Facility, where he remained until November 19, 2010, at which time he was transferred to Brookhaven Hospital. Turner he died at Brookhaven Hospital on January 2, 2011. An autopsy performed by the Suffolk County Medical Examiner's Office determined Turner's death to be a homicide and his cause of death to be complications following blunt impact injuries to the head and torso.

V.   Suffolk County's Policies

There are two "policies" relevant to Plaintiff's <u>Monell</u> claim against Suffolk County: (1) the Suffolk County Police Department's Rules and Procedures (the "Rules and Procedures") for reporting substance abuse; and (2) the Internal Affairs and Professional Standards Software System (the "IAPro System") used to monitor and flag potential police misconduct.

Before summarizing the evidence in the record, the Court finds it necessary to point out that the County's and Plaintiff's respective submissions have not enabled the Court to address all of the factual and legal issues related to Plaintiff's <u>Monell</u> liability claim.  First, the County's summary judgment submissions fail to address facts relevant to the IAPro System, including the reasons behind the modifications about which Plaintiff complains. In fact, the County's 56.1 Statement, which is ten paragraphs long, does not address the IAPro System.  Second, Plaintiff's response to the County's 56.1 Statement is difficult to follow.  Rather than responding concisely to the County's brief 56.1 statement and filing a separate counterstatement that raises the additional material facts as to which Plaintiff contends that there exists a genuine issue to be tried in accordance with the Eastern District's Local Rules, Plaintiff responded to nearly all of the County's statements with lengthy, topically organized, and argumentative dissertations.  For example, in response to the County's ninth statement of material fact, to wit, "No custom or policy of the County of Suffolk caused a violation of plaintiff's constitutional rights," Plaintiff provided a twenty-page response that includes at least eight topically organized subsections, much of which is argumentative.

Additionally, even though Plaintiff's response to the County's 56.1 Statement raises facts regarding the IAPro System,

the County did not file a reply, notwithstanding the directive in this Court's Individual Rules that "[i]f additional factual allegations are made by the opposing party, the moving party must file its own responsive 56.1 Statement addressing the additional assertions." (Individual Rules III.G.2.)  Further, Plaintiff only submitted excerpts of two deposition transcripts that may be central to the <u>Monell</u> liability issues in this case:  Chief Mango, the Commanding Officer of the IAB responsible for overseeing the implementation of the IAPro System, and Nancy Zinser, a County administrator with some unidentified role involving the IAPro System.

As such, there are many gaps in the current record regarding the at-issue County policies and how they operated, and the Court has constructed the following summary to the best of its ability based on the evidence before it.

A.   <u>County Rules and Procedures and Officer Hamilton's Substance Abuse Problems</u>

The Suffolk County Police Department's Rules and Procedures governed member conduct during the relevant period. (County P.D. Rules and Procedures, Ex. A, <u>attached to</u> Mitchell Decl.)  Relevant here, the Rules and Procedures prohibit members from "reporting for duty or being on duty while their ability to perform their duty is impaired by the use of an intoxicant." (County 56.1 Stmt. ¶ 1 (citing County P.D. Rules and Procedures

Ch. 2, Sec. 1(V)(B)).)  They further prohibit a member "from possessing or using, consuming or otherwise ingesting any unauthorized drug or steroid whether on duty or off." (<u>Id.</u> ¶ 2 (citing County P.D. Rules and Procedures Ch. 2, Sec. 1(V)(B)(1)(e)).)

In addition, the Rules and Procedures obligate members who "believe[] they have a substance abuse problem" to notify the Commanding Officer of the Medical Evaluation Bureau ("MEB") in the event the officer chooses to seek professional assistance, such as rehabilitation. (<u>Id.</u> ¶ 3 (citing County P.D. Rules and Procedures Ch. 2, Sec. 1(V)(B)(5)(a)).)  During the time period relevant here, Lieutenant Blaschuk ("Lt. Blaschuk") served as the Commanding Officer of the MEB. (<u>Id.</u>)

Members who believe they have substance abuse problems may "utilize their personal sick leave and other authorized leave to secure professional assistance," so long as they provide the requisite notice. (<u>Id.</u> (citing County P.D. Rules and Procedures Ch. 2, Sec. 1(V)(B)(5)).)  Upon notification, the MEB is required to notify the Commanding Officers of the IAB and the Employee Assistance Bureau. (<u>Id.</u> (citing County P.D. Rules and Procedures Ch. 2, Sec. 1(V)(B)(5)(a)).)  The Rules and Procedures impose additional requirements on an officer who seeks treatment, including that the member surrenders his or her firearm while

receiving treatment and agree to have his or her participation in the program monitored by the MEB.

Officer Hamilton entered Marworth Treatment Center ("Marworth") on October 15, 2008 to seek treatment for alcohol addiction. (Marworth Records, Ex. D, <u>attached to</u> Bennett Decl.) According to Marworth's records, Officer Hamilton had been consuming twenty beers per day for the previous two years and admitted to using drugs or alcohol before or during work. (<u>Id.</u> at 9, 18.) Officer Hamilton was discharged from Marworth on November 10, 2008. (<u>Id.</u> at p. 2.)

Officer Hamilton did not disclose this information as required by the Rules and Procedures. As he stated during his deposition, "I didn't use the police psych services . . . . I went through the insurance, went to regular doctors, cause, honestly, I didn't trust them." (Officer Hamilton Depo. Tr. at 159.) He added that he did not "want people running their mouth within the department and reflecting badly upon [him]." (<u>Id.</u> at 160.)

Officer Hamilton avoided the Rules and Procedures' disclosure obligations as follows: On October 12, 2008, three days prior to being admitted to Marworth, Officer Hamilton submitted an "injured employee recurrence report" indicating that he exacerbated a recurring job-related shoulder separation injury. (Officer Hamilton Records at 1, Ex. X, <u>attached to</u> Bennett Decl.)

23

On October 14, 2008, he reported to Orthopedic Associates of Long Island for treatment regarding the same. (Id. at 3.) His treating physician at Orthopedic Associates of Long Island directed that he perform no work activities until further notice. (Id.) On October 15, 2008, Officer Meehan, the Commanding Officer at the Fifth Precinct where Officer Hamilton was stationed, signed off on Officer Hamilton's worker's compensation claim. (Id. at 1.) Starting on October 21, 2008, Lt. Blaschuk began seeking information about Officer Hamilton's injury-related leave, directing him to schedule an appointment to see a police surgeon. (Id. at 4.) However, on October 27, 2008, Officer Meehan advised Lt. Blaschuk that Officer Hamilton had been unable to schedule such an appointment "due to an unrelated private medical matter." (Id. at 5.) Lt. Blaschuk continued to seek information, sending two subsequent requests to Officer Meehan and one directly to Officer Hamilton. (See id. at 6-8.) On February 19, 2009, Officer Hamilton responded to Lt. Blaschuk's requests for information, advising that he had been on leave from active duty from October 14, 2008 through December 1, 2008 for the shoulder injury and pre-scheduled vacation. (Id. at 9.) Based on Officer Hamilton's representation, Lt. Blaschuk approved his worker's compensation claim.

Plaintiff adduces additional documentation to show that Officer Hamilton continued to use illicit drugs after his discharge

24

from Marworth.  Specifically, on or about June 21, 2009, Officer Hamilton sustained another work-related injury for which he sought treatment.  In several treatment reports from around that time through June 2010 detailing medical treatment Officer Hamilton sought for pain management, under the "social history" section, the report indicates Officer Hamilton "uses illicit drugs." (Officer Hamilton Medical Records at 9, 12, Ex. C, <u>attached to</u> Bennett Decl.)  At his deposition, Officer Hamilton vehemently denied using illicit drugs or drinking during that time period and suggested that the reports are mistaken.  (Officer Hamilton Depo. Tr. at 144:23-25; 146:19-25.)  He added that drug tests taken by the County would corroborate his testimony; however, in response to Plaintiff's interrogatories, the County stated that no drug tests were administered to Officer Hamilton during the 2008 to 2010 time period.  (County Interrogatory Responses, Ex. L, <u>attached to</u> Bennett Decl.)

        B.    <u>The IAPro System</u>

        Implemented by the County in 2005, the IAPro System is "designed to assist law enforcement Internal Affairs and Professional Standards Units."  (IAPro System Manual at 4, Ex. H, <u>attached to</u> Bennett Decl.)  The IAPro System facilitates "early intervention" or "the proactive identification of possible performance problems within the organization," and the "handling of citizen complaints and other internal investigations."  (<u>Id.</u>)

The IAPro System "centers around the concept of incidents," such as citizen complaints or reportable events like uses of force. (Id.)  To enable early intervention of potential performance problems, incidents are linked to an officer to generate alerts when certain thresholds are met.  (Id. at 24.)  Put simply, the IAPro System generates an early warning alert for an officer who is linked to a certain number of specific types of incidents within a predetermined period of time.  For example, when three or more citizen complaints are received against a particular officer during any twelve-month period, a "citizen complaint" alert will be triggered.  (Id.)

Plaintiff generally alleges that the County modified the IAPro System's early warning alert parameters to limit the number of alerts that it would generate.  Specifically, Plaintiff points out that the County reduced the incidents that could trigger an alert from thirty-six in 2005 to five in 2010.  (County General Orders at 3, 23, Ex. I, attached to Bennett Decl.)  According to the testimony of Chief Mango, the County downgraded the number of trigger incidents and threshold parameters because they were generating too many alerts.  By the time of the underlying incident here, the IAPro System triggered an early warning alert for a specific officer when the following thresholds were met:

(1)  three or more citizen complaints were made against the officer in any twelve-month period;

(2)  four or more use-of-force incidents were entered against the officer in any six-month period;

(3)  the officer was involved in three or more vehicle pursuits in any twelve-month period;

(4)  the officer was involved in six or more of any type of incident in any six-month period; and

(5)  officer missed three or more court appearances in a twelve-month period.

(Id.)

In addition to the alleged manipulation of the IAPro System parameters, Plantiff also premises her Monell claim on the County's response to alleged incidents of excessive force, both generally and as to Officer Hamilton in particular. As a general matter, Plaintiff raises the IAPro Early Warning Report Summary from 2007, which shows that 131 of the 175 early warning reports were "forwarded to patrol for review," without any indication as to whether they were investigated further. (Early Warning Report Summary, Ex. O, attached to Bennett Decl.) Plaintiff also points out that, according to the history of claims investigated by the Internal Affairs Bureau from 2005 through 2010, only one claim of excessive force out of 659 complaints was substantiated. (IAB Excessive Force Complaints History, Ex. P, attached to Bennett Decl.)[8]   The other complaints were either unsubstantiated,

---

[8] Plaintiff states that this exhibit, which appears to be an attachment to an email chain, shows that there were "some 775 incidents claiming excessive force" during the 2005 through 2010 period.  (Pl. 56.1 Counterstmt. to County ¶ 9, p. 28.)  By the Court's math, however, there were 659 civilian complaints of

unfounded, or the officers were exonerated.[9]    In addition, Plaintiff points to Officer Hamilton's "known history of excessive force complaints," as catalogued in his IAB report (Officer Hamilton IAB Report, Ex. J, underlined attached to Bennett Decl.) and supplemented by the early warnings generated through the IAPro System (Officer Hamilton Early Warning Report, Ex. K, underlined attached to Bennett Decl.).  The IAB report details nine complaints, including six for undue or excessive force.  (Officer Hamilton IAB Report, Ex. J.)  The Officer Hamilton Early Warning Report, which for reasons that are unexplained is more inclusive than the IAB report, details fifteen use-of-force incidences.

---

excessive force during that time period.  The Court does not know how Plaintiff arrived at 775.  Further, it is unclear whether the 659 complaints include the Fifth Precinct, where Officers Hamilton and LaRosa were stationed, or whether the total listed at the top of the email chain is for the Fifth Precinct.  If the latter, then there were 116 excessive force complaints during the period, of which 33 were unfounded, 76 were exonerated, 7 were unsubstantiated, and 0 were substantiated.  (IAB Excessive Force Complaints History at 1.)

[9] As Lt. Pirone explained at his deposition, a finding of substantiated means that the allegations in the complaint were found to be accurate; a finding of unsubstantiated means that the allegations in the complaint could not be proven or disproved; a finding of exonerated means that the allegations of misconduct were disproved; and a finding of unfounded means that alleged act did not occur.  (Lt. Pirone Depo. Tr. at 14-17, Ex. H, underlined attached to Conway Decl.)

PROCEDURAL HISTORY

Plaintiff initiated this action by filing three separate complaints that were consolidated by then-District Court Judge Joseph F. Bianco.[10]  (See Consolidation Order, ECF No. 17.)  Because Plaintiff did not file a consolidated complaint, the Court summarizes the claims asserted in each of the separate complaints.

In the first-filed action, No. 12-CV-0909, Plaintiff sued the County of Suffolk, Suffolk County Police Department, and ten police officer John Doe defendants, asserting claims under Section 1983 for false arrest, excessive force, Monell liability, and abuse of process; claims under Sections 1981, 1985 (conspiracy and abuse of process), and 1986 (failure to intervene); and claims under New York State law for negligence, wrongful death, and battery.

In the second-filed action, No. 12-CV-1198, Plaintiff sued Brookhaven Hospital, Dr. MacLeod, and one John Doe defendant, asserting a federal claim under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 13955dd et seq., as well as two New York State law claims for negligence and wrongful death.

In the third-filed case, No. 12-CV-6415, Plaintiff sued Officers Hamilton and LaRosa, plus nine other police officer or

---

[10] The case was reassigned to the undersigned on May 31, 2019.

police sergeant defendants,[11] asserting claims under Section 1983 for false arrest, excessive force, and abuse of process; Sections 1981, 1985 (conspiracy and abuse of process), and 1986 (failure to intervene); and New York State law for negligence, wrongful death, and battery.

The parties completed discovery on October 10, 2019, and Defendants filed pre-motion conference letters seeking leave to file their respective motions for summary judgment on March 13, 2020. The Court granted Defendants leave at an April 12, 2020 pre-motion conference, resulting in the instant motion practice.

DISCUSSION

I.    Legal Standard

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Material facts are those which might affect the outcome of the suit under the governing law, and a dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Wagner v. Chiari & Ilecki, LLP, 973 F.3d 154, 164 (2d Cir. 2020) (quoting Coppola v. Bear Stearns & Co., 499 F.3d 144, 148 (2d Cir. 2007)) (internal quotation marks omitted). The movant bears the burden of establishing that there are no

---

[11] Plaintiff withdrew her claims against the nine other police officer defendants. (See ECF No. 97.)

genuine issues of material fact for trial.  Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant[s] may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim."  Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).

On a motion for summary judgment the Court considers the "pleadings, deposition testimony, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits."  Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).  In reviewing the record, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).  When drawing inferences from evidence in the record in favor of the non-moving party, however, a court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts."  Berk v. St. Vincent's Hosp. & Med. Ctr., 380 F. Supp. 2d

334, 342 (S.D.N.Y. 2005) (quoting <u>County of Suffolk v. Long Island Lighting Co.</u>, 907 F.2d 1295, 1318 (2d Cir. 1990)).

II.  <u>Analysis</u>

First, the Court addresses Plaintiff's federal claims arising under Sections 1981, 1983, 1985, and 1986 as asserted against the Officer Defendants and the County.  Second, the Court addresses Plaintiff's EMTALA claim against the Hospital Defendants.  Last, the Court addresses Plaintiff's New York State law claims.

A.  <u>Section 1983 Claims</u>

Section 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of any rights, privileges, or immunities secured by the Constitution or the laws of the United States.  <u>See</u> 42 U.S.C. § 1983; <u>Cornejo v. Bell</u>, 592 F.3d 121, 127 (2d Cir. 2010).  Section 1983 "is not itself a source of substantive rights."  <u>Patterson v. County of Oneida</u>, 375 F.3d 206, 225 (2d Cir. 2004) (citing <u>Baker v. McCollan</u>, 443 U.S. 137, 144 n.3 (1979)).  Rather, Section 1983 provides "a method for vindicating federal rights elsewhere conferred," such as those conferred by the Fourth Amendment to the Constitution.  <u>Id.</u>  "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims

if such deterrence fails." Wyatt v. Cole, 504 U.S. 158, 161 (1992).

Plaintiff raises the following causes of action under Section 1983: (1) excessive force; (2) false arrest; (3) abuse of process; and (4) Monell liability.

### 1.    Excessive Force & Qualified Immunity

#### i.    Applicable Law

"Qualified immunity balances two important interests -- the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009); see also Anderson v. Creighton, 483 U.S. 635, 639 (1987) (summarizing the "conflicting concerns" courts face when applying qualified immunity). Public officials like the Officer Defendants are entitled to qualified immunity unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time." D.C. v. Wesby, 138 S. Ct. 577, 589 (2018) (citing Reichle v. Howards, 566 U.S. 658, 664 (2012)).

Here, Plaintiff asserts a violation of Turner's Fourth Amendment right to be free from excessive use of force by the Officer Defendants. "Under the Fourth Amendment, which governs the use of force in connection with an arrest, law enforcement

33

officers may use only such force as is objectively reasonable under the circumstances." O'Bert ex rel. Est. of O'Bert v. Vargo, 331 F.3d 29, 36 (2d Cir. 2003) (citing Graham v. Connor, 490 U.S. 386, 397 (1989)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97. For that reason, "the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective," not with the "20/20 vision of hindsight." Saucier v. Katz, 533 U.S. 194, 205 (2001) (quoting Graham, 490 U.S. at 393, 396-97). Thus, to determine whether the force used by officers to effectuate a particular seizure is reasonable, the court must examine "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396.

With respect to whether a right is "clearly established," "[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 202; see also Abrams v. Dep't of Pub. Safety, 764 F.3d 244, 255

(2d Cir. 2014) (An officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011))). "Clearly established law" should not be defined at "a high level of generality," but "must be particularized to the facts of the case." White v. Pauly, 137 S. Ct. 548, 552 (2017) (first quoting al-Kidd, 563 U.S. at 742; and then quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

As noted supra, at this juncture the Court must resolve all ambiguities and draw all factual inferences in favor of Plaintiff, the party against whom summary judgment is sought. "Summary judgment should not be granted on the basis of a qualified immunity defense premised on an assertion of objective reasonableness unless the defendant 'show[s] that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law.'" Est. of Jaquez v. City of New York, 104 F. Supp. 3d 414, 434 (S.D.N.Y. 2015) (quoting Ford v. Moore, 237 F.3d 156, 162 (2d Cir. 2001)), aff'd sub nom., 706 F. App'x 709 (2d Cir. 2017). Further, in a case involving deadly force where, like here, "the witness most likely to contradict [the police officer's] story -- the

35

[deceased] -- is unable to testify . . . the court may not simply accept what may be a self-serving account by the police officer." Id. (first alteration in original) (quoting O'Bert, 331 F.3d at 37). Rather, the Court must also consider "circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." O'Bert, 331 F.3d at 37.

Because the "use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness," Saucier, 533 U.S. at 202, whether Plaintiff has made out a violation of his constitutional right and whether that right was clearly established at the time of the alleged misconduct may "ultimately converge on one question in excessive force cases: Whether in the particular circumstances faced by the officer, a reasonable officer would believe that the force employed was lawful." Weather v. City of Mount Vernon, 474 F. App'x 821, 822 (2d Cir. 2012) (quoting Cowan ex rel. Estate of Cooper v. Breen, 352 F.3d 756, 764 n.7 (2d Cir. 2003)).

ii. Application

The converging excessive force and qualified immunity issues in this case present an exceedingly close call. However, the Court is unable to conclude on the record before it that no reasonable jury, viewing the evidence in the light most favorable

36

to the Plaintiff, could conclude that the Officer Defendants' actions were objectively unreasonable according to clearly established law. Rather, as set forth below, there is sufficient circumstantial evidence in the record from which a rational factfinder could determine that the Officer Defendants' use of force was not objectively reasonable under the circumstances.

Turning to the Graham factors to assess the reasonableness of the Officer Defendants' use of force, the Court finds on the undisputed record that the first and third factors -- the nature and severity of the crime at issue and whether the decedent actively resisted or attempted to evade arrest, respectively -- favor the Officer Defendants. It is undisputed that Turner, who had been pulled over for erratic driving and suspicion of DWI, sped away from the Officer Defendants, endangered the officers and the general public, and caused a vehicle accident from which he fled by foot. He also violently resisted arrest. Nevertheless, while an officer "may be justified in using some degree of force when making an arrest, the officer is not entitled to use an unlimited amount of force, even where the arrestee resists or assaults the officer." Garcia v. Greco, No. 05-CV-9587, 2010 WL 446446, at *4 (S.D.N.Y. Feb. 9, 2010); see also Sullivan v. Gagnier, 225 F.3d 161, 165-66 (2d Cir. 2000) ("The fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the

officer's use of <u>some</u> degree of force, but it does not give the officer license to use force without limit." (emphasis in original)). "An arrestee's resistance to arrest is a factor that justifies the use of greater force, but such resistance, without more, does not warrant summary dismissal of an excessive force claim." <u>Marlin v. City of New York</u>, No. 15-CV-2235, 2016 WL 4939371, at *11 (S.D.N.Y. Sept. 7, 2016).

As to the second factor -- whether Turner posed an immediate threat to the safety of the Officer Defendants -- there is simply too much circumstantial evidence in the record that, viewed in Plaintiff's favor, tends to discredit Officers Hamilton and LaRosa's version of events, a version that Plaintiff is not here to contest. <u>See</u> O'Bert, 331 F.3d at 37. To begin, there is the question of whether Turner was in possession of a knife. The Officer Defendants are adamant that Turner was armed with a five-inch knife the night of the incident, and certainly there is evidence in the record supporting this conclusion, including Officer Hamilton's call to dispatch regarding a metallic object and the testimony of several officers that a knife was recovered at the scene of the crime. On the other hand, Officer LaRosa never saw a knife that evening. (Officer LaRosa Depo. Tr. at 25:8-10.) At bottom, that knife was lost, so there is no way for the Court to conclude as a matter of law whether Turned was armed with a knife or to whom the knife belonged. It will be for the jury to

consider the credibility of the testimony of those officers in the chain of custody who assert they recovered, and subsequently mishandled and lost, the knife that Turner allegedly wielded that night.  In any event, assuming Turner had a knife the night of the incident, it is undisputed that Turner had dropped his knife by the time Officer Hamilton moved to arrest him.  This fact distinguishes the cases cited by Officer Hamilton, wherein the assailant refused to comply with police officer orders to drop a knife.  (Officer Hamilton Support Memo at 9.)

Further, a reasonable jury could conclude the Officer Defendants acted unlawfully based on the photographic evidence from the night of the incident.  Cf. Rodriguez v. City of New York, 802 F. Supp. 2d 477, 481 (S.D.N.Y. 2011) (finding the plaintiff's claims of excessive force belied by photographic evidence taken of the plaintiff the night of the alleged incident); Berman v. Williams, No. 17-CV-2757, 2019 WL 4450810, at *7 (S.D.N.Y. Sept. 17, 2019) (same).  Photographs of Turner from the night of the incident show traumatic injuries (Exs. U, UU, attached to Bennett Decl.), while photographs of the Officer Defendants show little more than a ripped pantleg (Ex. T, attached to Bennet Decl.).  According to Plaintiff's expert, Plaintiff's injuries are consistent with kicking, which Officer LaRosa could not rule out during his deposition testimony.  (deRoux Report at 10, Ex. CC, attached to Bennet Decl.; Officer LaRosa Depo. Tr. at 118-20.)

Indeed, the Officer Defendants outnumbered Turner two-to-one. Cf. Brown v. City of New York, 798 F.3d 94, 103 (2d Cir. 2015) (noting size disparity between two officers and arrestee as one fact requiring "the assessment of a jury"); Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 123 (2d Cir. 2004) (excessive force inquiry "requires careful attention to the facts and circumstances of each particular case"); Samples v. Atlanta, 846 F.2d 1328 (11th Cir. 1988) (finding summary judgment on the plaintiff's excessive force claim inappropriate where evidence, including the fact that the officer weighed nearly 100 pounds more than the suspect, created issues of material fact). Moreover, Officer Hamilton appears to have admitted to striking Turner in the head with his flashlight, a fact he did not disclose during the internal investigation into the incident. Of course, a jury might reasonably conclude that the Officer Defendants used only the amount of force necessary to subdue an aggressive arrestee whose pain tolerance may have been elevated due to the PCP in his system. But the foregoing circumstantial evidence is enough from which a fact finder could apply his or her common sense to conclude that the Officer Defendants' force was unreasonable. Brown, 798 F.3d at 103 (reversing grant of summary judgment on excessive force claim and "leav[ing] the factual determination of excessiveness to a jury,

whose collective common sense, informed by their life experiences, may well exceed that of" the assigned judge).[12]

With respect to whether the unlawfulness of the Officer Defendants' conduct was "clearly established" at the time of the incident, it was well settled that the prohibition of excessive force in the course of an arrest is clearly established. Outlaw v. City of Hartford, 884 F.3d 351, 364 (2d Cir. 2018) ("That the law prohibits excessive force when using force to make an arrest is neither a recent nor surprising development."); Mickle v. Morin, 297 F.3d 114, 122 (2d Cir. 2002) ("[I]t was well established that the use of excessive force in the course of an arrest is constitutionally prohibited."); Thomas v. Roach, 165 F.3d 137, 143 (2d Cir. 1999). The Court is mindful that "it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness." Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018). But here, having

---

[12] Plaintiff's argument that the Officer Defendants should have used less lethal force, such as a taser, fails to persuade, however. See Mullenix v. Luna, 577 U.S. 7, 15 (2015) (holding the plaintiff could not establish that the officer-defendants were not entitled to qualified immunity based on evidence that the officers "selected one dangerous alternative over another"); Brown v. City of New York, 798 F.3d 94, 103 (2d Cir. 2015) ("[T]he availability of a less aggressive way of accomplishing an arrest [does not] necessarily mean[] that the technique that was used is thereby shown to have been excessive."). In any event, there is evidence in the record that the Officer Defendants attempted to deploy pepper spray.

carefully considered the competing factual claims in the record and making all inferences in Plaintiff's favor, the Court is unable to find as a matter of law the Officer Defendants are entitled to qualified immunity. See Davis v. City of New York, No. 04-CV-3299, 2007 WL 755190, at *15-16 (E.D.N.Y. Feb. 15, 2007) (Bianco, J.) ("If the jury determines that [the plaintiff's] account of the events is entirely accurate and she suffered a legally cognizable injury, this case would not involve 'the hazy border between excessive and acceptable force,' Saucier v. Katz, 533 U.S. 194, 206 (2001), but rather the violation of a clearly established right for which qualified immunity is unavailable."). "Where the circumstances are in dispute, and 'contrasting accounts . . . present factual issues as to the degree of force actually employed and its reasonableness,' a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity." Mickle, 297 F.3d at 122 (quoting Kerman v. City of New York, 261 F.3d 229, 239 (2d Cir. 2001)); see also Hartline v. Gallo, 546 F.3d 95, 103 (2d Cir. 2008) ("[If] a reasonable jury might determine that Defendants were acting in a fashion that clearly violated [Plaintiff's] Fourth Amendment rights . . . Defendants are . . . not entitled to summary judgment on the issue of qualified immunity."); Pal v. Cipolla, No. 20-4222-CV, 2022 WL 766417, at *3 (2d Cir. Mar. 14, 2022); Routier v.

O'Hara, No. 08-CV-02666, 2013 WL 3777100, at *12 (E.D.N.Y. July 17, 2013).

Accordingly, the Officer Defendants' motion for summary judgment as to Plaintiff's excessive force claim is DENIED.

    2.   <u>False Arrest</u>

       i.   <u>Applicable Law</u>

To succeed on a Section 1983 claim for false arrest, the plaintiff must show "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." <u>Avant v. Miranda</u>, No. 21-CV-0974, 2021 WL 1979077, at *4 (E.D.N.Y. May 18, 2021) (quoting <u>Wheeler v. Kolek</u>, No. 16-CV-7441, 2020 WL 6726947, at *4 (S.D.N.Y. Nov. 16, 2020)). The existence of probable cause is a complete defense to a claim for false arrest. <u>Ackerson v. City of White Plains</u>, 702 F.3d 15, 19 (2d Cir. 2012). At the arrest stage, the Second Circuit has described probable cause as "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed . . . a crime." <u>Stansbury v. Wertman</u>, 721 F.3d 84, 89 (2d Cir. 2013) (quoting <u>Jaegly v. Couch</u>, 439 F.3d 149, 152 (2d Cir. 2006)); <u>see also</u> <u>Ashley v. City of New York</u>, 992 F.3d 128, 136 (2d Cir. 2021). "To assess probable cause, a court considers only the facts 'available to the

officer at the time of the arrest and immediately before it.'" Ashley, 993 F.3d at 136 (quoting Stansbury, 721 F.3d at 89).

　　ii.　Application

　　　　The Officer Defendants are entitled to summary judgment on Plaintiff's false arrest claim. The undisputed facts show that Officers LaRosa and Richardsen observed Turner recklessly operating his vehicle, swerving, travelling at a high rate of speed, and failing to stop at a stop sign. When Officers LaRosa and Richardsen pulled Turner over, he pulled off at a high rate of speed, leading to a car chase that endangered himself, the officers, and the general public. The car chase ended in a collision, with Turner fleeing from the scene. On these undisputed facts, no reasonable juror could conclude that the Officer Defendants lacked probable cause to arrest Turner.

　　　　Plaintiff argues that genuine disputes of material fact preclude a finding that the Officer Defendants had probable cause to arrest Turner as to all the charges brought against him, specifying that they lacked probable cause to charge Turner with "menacing" because of the disputes as to whether Turner wielded a knife on the night of the incident. (Pl. Opp'n to Officer Hamilton at 11.) That argument is without merit. "[A] claim for false arrest turns only on whether probable cause existed to arrest a defendant . . . . [I]t is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any

charge actually invoked by the arresting officer at the time of arrest. Stated differently, when faced with a claim for false arrest, we focus on the validity of the <u>arrest</u>, and not on the validity of each charge." <u>Jaegly v. Couch</u>, 439 F.3d 149, 154 (2d Cir. 2006) (emphasis in original).[13]

Accordingly, the Officer Defendants' motion for summary judgment as to Plaintiff's false arrest claim is GRANTED.

### 3. Abuse of Process

A Section 1983 claim for malicious abuse of process lies against a defendant who "(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." <u>Savino v. City of New York</u>, 331 F.3d 63, 76 (2d Cir. 2003) (quoting <u>Cook v. Sheldon</u>, 41 F..3d 73, 80 (2d Cir. 1994)). "[T]o state a claim for abuse of criminal process, it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim that they aimed to achieve a

---

[13] Since there was no violation of Turner's constitutional right to be free from false arrest, it is unnecessary to address the Officer Defendants' defense of qualified immunity as to this claim. <u>Liggins v. Griffo</u>, 356 F. App'x 537, 540 (2d Cir. 2009) (summary order).

collateral purpose beyond or in addition to his criminal prosecution." Id. at 77.

Here, there is no evidence in the record that the Officer Defendants aimed to achieve an objective other than Turner's arrest and prosecution. Accordingly, the Officer Defendants' motion for summary judgment as to Plaintiff's malicious abuse of process claim is GRANTED.[14]

### 4. Monell Liability

Next, the County seeks summary judgment of Plaintiff's Section 1983 Monell claims, and Plaintiff cross-moves for summary judgment regarding the same.

### i. Applicable Law

It is well established that a municipality such as the County cannot be held liable under Section 1983 on a respondeat superior theory. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978); Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008). Rather, the plaintiff must demonstrate the municipality, through its deliberate conduct, "was the moving force behind the alleged injury." Roe, 542 F.3d at 37. To that end, the plaintiff must plead and prove three elements: "(1) an official policy or custom that (2) causes the plaintiff to be

---

[14] Again, because Plaintiff cannot establish a violation of Turner's constitutional rights, it is unnecessary to address the Officer Defendants' defense of qualified immunity as to this claim. Liggins, 356 F. App'x at 540.

subjected to (3) a denial of a constitutional right." Lucente v. County of Suffolk, 980 F.3d 284, 297 (2d Cir. 2020) (Bianco, J.) (quoting Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007)).

The plaintiff can satisfy the municipal "policy or custom" requirement by alleging:

> (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom through which constructive notice is imposed upon policymakers; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised 'deliberate indifference' to the rights of the plaintiff.

> Ying Li v. City of New York, 246 F. Supp. 3d 578, 636 (E.D.N.Y. 2017) (citing Second Circuit decisions); see also Vives v. City of New York, 524 F.3d 346, 353 (2d Cir. 2008) (official policy); Hu v. City of New York, 927 F.3d 81, 105 (2d Cir. 2019) (action by official with policymaking authority); Lucente, 980 F.3d at 297-308 (persistent and widespread custom and practice); Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 127 (2d Cir. 2004) (failure to train or supervise); Reynolds v. Giuliani, 506 F.3d 183, 191-93 (2d Cir. 2007) (failure to supervise); Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995) (failure to supervise); Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983) (failure to discipline).

"Once a plaintiff has demonstrated the existence of a municipal policy, a plaintiff must then establish a causal connection, or an 'affirmative link,' between the policy and the deprivation of his constitutional rights." Deferio v. City of Syracuse, 770 F. App'x 587, 590 (2d Cir. 2019) (citing Vippolis v. Village of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985)); accord Bd. of the County Comm'rs v. Brown, 520 U.S. 397, 404 (1997) (holding that plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged" (emphasis in original)).  In other words, the plaintiff must establish that the policy was the moving force behind the alleged injury.  Roe, 542 F.2d at 37.  The Second Circuit has equated the moving force standard with that of proximate causation. Stern v. City of New York, No. 12-CV-5210, 2015 WL 918754, at *5 (E.D.N.Y. Mar. 3, 2015) (citing Cash v. County of Erie, 654 F.3d 324, 340 (2d Cir. 2011)).

ii.  Application

Although Plaintiff's Monell claims are difficult to discern, the Court distills from the briefing that Plaintiff is pursuing four distinct theories of Monell liability.  First, Plaintiff argues that the County's Rules and Procedures for reporting substance abuse problems among its members were designed to enable officers to evade MEB oversight and potential sanctions,

48

as Officer Hamilton allegedly did here, which resulted in constitutional injuries.

Second, Plaintiff contends that data from the County's IAB investigations and IAPro System history show that "the County of Suffolk established an actual custom and practice" -- or perhaps, better put, acquiesced to a widespread de facto custom -- "whereby members of the Police were certain not to be found responsible for any alleged Excess Force claims." (Pl. Opp'n to County at 10-11.)  Third, and relatedly, the Court considers whether Plaintiff can proceed under a "failure-to-supervise" theory of liability, namely, that the County was deliberately indifferent to an obvious need to better supervise Officer Hamilton to protect against constitutional violations, as evidenced by his history of excessive force complaints, including the allegations in the present Complaint.

Last, Plaintiff argues that the IAPro System the County implemented to gather data regarding policing incidents and to provide "proactive identification of possible performance problems within the organization" constitutes an official County policy to violate Plaintiff's constitutional rights, because the County customized the IAPro System's parameters in such a way as to limit the number of performance alerts brought to the attention of department supervisors.

49

In sum, while Plaintiff has adduced scores of records in an effort to demonstrate a County policy to violate constitutional rights, she has not articulated a cogent theory of <u>Monell</u> liability.

### a.    The County Rules and Procedures

Plaintiff's first <u>Monell</u> claim is based upon Officer Hamilton's failure to comply with the County's Rules and Procedures for reporting substance abuse.  "In order to establish <u>Monell</u> liability based upon a 'persistent and widespread' practice by a subordinate municipal employee (or employees) other than a policymaker, the employee's unconstitutional conduct must be 'so manifest as to imply the constructive acquiescence of senior policy-making officials.'"  Lucente, 980 F.3d at 297-98 (quoting <u>Sorlucco v. N.Y.C. Police Dep't</u>, 971 F.2d 864, 870-71 (2d Cir. 1992)).  "In other words, there must be 'sufficient instances of tolerant awareness by supervisors of abusive conduct to support an inference that they had a policy, custom or usage of acquiescence in such abuse.'"  <u>Id.</u> at 298 (quoting <u>Jones v. Town of East Haven</u>, 691 F.3d 72, 82 (2d Cir. 2012)).

In view of these principles, there are two fatal flaws with this aspect of Plaintiff's <u>Monell</u> claim.  First, Plaintiff submits no evidence of County officers eliding the Rules and Procedure's disclosure requirements beyond Officer Hamilton's alleged elision here.  "Proof of a single incident of

unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." Tuttle, 471 U.S. at 823-24; see also Jones, 691 F.3d at 81 (holding isolated acts of constitutionally violative conduct by non-policy-making municipal employees are generally not sufficient to demonstrate a municipal custom or policy that would justify imposition of Monell liability). Thus, Plaintiff cannot demonstrate that County officers evading oversight by County supervisors for substance abuse issues is a "practice[] so persistent and widespread as to practically have the force of law." Connick v. Thompson, 563 U.S. 51, 61 (2011).

Second, the substance abuse reporting requirement of the County Rules and Procedures about which Plaintiff complains is not itself unconstitutional, nor is the fact that Officer Hamilton failed to follow the Rules and Procedures. Thus, with respect to Officer Hamilton's failure to abide by the Rules and Procedures, it can hardly be said that there is evidence to support a "policy of inaction," whereby a municipal policymaker ratifies his subordinate's unconstitutional conduct. See Connick, 563 U.S. at 61-62; Amnesty Am., 361 F.3d at 127. Rather, to sustain her Monell claim Plaintiff is forced to argue a more tenuous causal chain: Because Officer Hamilton did not report his substance abuse issues

according to the Rules and Procedures, the MEB did not investigate and suspend him, and because Officer Hamilton was not suspended, he committed the constitutional tort that gave rise to this lawsuit.  Without deciding whether Plaintiff could pursue her Monell claim based on such a causal connection, the Court finds that evidence of Officer Hamilton's singular violation of the County Rules and Procedures is insufficient to establish a practice so manifest as to imply the constructive acquiescence of senior policymaking officials.  Rubio v. County of Suffolk, 328 F. App'x 36, 38 (2d Cir. 2009) (holding "a few violations by a small group of subordinate County employees with no policymaking authority [cannot] amount to the pervasive and widespread custom or practice necessary for municipal liability"); Jones, 691 F.3d at 80-82.  As the Supreme Court has made clear, "some limitation must be placed on establishing municipal liability through policies that are not themselves unconstitutional, or the test set out in Monell will become a dead letter," because "if one retreats far enough from a constitutional violation some municipal 'policy' can be identified behind almost any such harm inflicted by a municipal official." Tuttle, 471 U.S. at 823.

b.    The County's Response to Police Misconduct

Next, the Court addresses Plaintiff's Monell claim based on the County's responses to excessive force claims, which suggests a failure-to-supervise or discipline theory of liability.

To prevail on such a theory for Monell liability, the plaintiff must show that the municipality was deliberately indifferent to an obvious need for better supervision or training to protect against constitutional violations. Vann, 72 F.3d at 1049; Reynolds, 506 F.3d at 192; Amnesty Am., 361 F.3d at 127-28. "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations." Vann, 72 F.3d at 1049; see also Fiacco v. City of Rensselaer, 783 F.2d 319, 328 (2d Cir. 1986). Further, it may be inferred that the municipality acted with deliberate indifference towards these complaints if they "are followed by no meaningful attempt . . . to investigate or to forestall further incidents." Vann, 72 F.3d at 1049. Importantly, "[t]he municipality's failure to take action must constitute deliberate indifference, rather than mere negligence or bureaucratic inaction.'" Alwan v. City of New York, 311 F. Supp. 3d 570, 580-81 (E.D.N.Y. 2018) (quoting Amnesty Am., 361 F.3d at 128); see also Jones, 691 F.3d at 81-82.

Plaintiff here points to Officer Hamilton's "known history of excessive force complaints," as catalogued in his IAB

report (Officer Hamilton IAB Report, Ex. J) and supplemented by the early warnings generated through the IAPro System (Officer Hamilton Early Warning Report, Ex. K). The IAB report details nine complaints, including six for undue or excessive force. (Ex. J.) Officer Hamilton's Early Warning Report, which for reasons that are unexplained is more inclusive than the IAB report, details fifteen use-of-force incidences. (Ex. K.) "Courts in the Second Circuit routinely hold that multiple civilian complaints against an officer regarding conduct similar to that exhibited toward a plaintiff is enough for a jury to find the requisite degree of indifference to support failure to supervise liability under Monell." Alwan, 311 F. Supp. 3d at 583–84 (quoting Coggins v. County of Nassau, 254 F. Supp. 3d 500, 520–21 (E.D.N.Y. 2017) (collecting cases)). However, even assuming arguendo that Officer Hamilton's history of complaints creates a triable issue as to whether it was obvious to the County that there was a risk Officer Hamilton would deploy excessive force against arrestees, Plaintiff's failure-to-supervise and failure-to-discipline theories are unavailing because she has not presented evidence from which a rational factfinder could conclude that the County acted with deliberate indifference to this risk.

On this issue, Plaintiff has not identified any complaints against Officer Hamilton to which the County failed to respond. Rather, IAB investigators concluded that three of the

excessive force claims were unfounded, and exonerated Officer Hamilton on the remaining three complaints. As courts in this Circuit routinely find, unsubstantiated complaints "do not provide a valid basis for concluding that [the municipality] was deliberately indifferent to [the officer's] use of excessive force, because they do not, by themselves, establish that he used excessive force in the first place." Alwan, 311 F. Supp. 3d at 584 (citing Tieman v. City of Newburgh, No. 13-CV-4178, 2015 WL 1379652, at *21 (S.D.N.Y. Mar. 26, 2015)). Further, the mere fact that two of the complaints generated follow-on civil lawsuits that settled without an admission of liability by the County "does not mean that the prior suits were meritorious." Hart v. City of Binghamton, No. 10-CV-1064, 2012 WL 1565085, at *7 (N.D.N.Y. May 2, 2012).

Plaintiff's remaining arguments regarding the County's general approach to supervising its officers are equally unavailing. To the extent Plaintiff argues that the lack of substantiation of the incidents identified in the IAPro Early Warning Report Summary from 2007 or the five-year statistical history of claims investigated by the IAB demonstrates a widespread custom of or deliberate indifference to excessive force by County officers, such an argument is foreclosed as a matter of law. See Rasmussen v. City of New York, 766 F. Supp. 2d 399, 408-10 (E.D.N.Y. 2011). Similar to Plaintiff's arguments here, in

Rasmussen, the plaintiff attempted to establish Monell liability by arguing the defendant-city had a custom and practice to take "no action against its police officers when they violate an individual's rights" and simply "rubber-stamp all complaints against its officers as unsubstantiated and almost never require any training or supervision as a result of a complaint." Id. at 408. In support of this theory, the plaintiffs submitted evidence of complaints of police misconduct against the city, both generally and specific to the officer defendants. Id. at 408-09. The Honorable Judge Brian M. Cogan rejected the plaintiffs' Monell claim, reasoning that the fundamental "problem" with the plaintiffs' theory was that "none of these facts show that there has been any violation of constitutional rights." Id. at 409 (emphasis in original). Judge Cogan further rejected the plaintiffs' "assumption" that the mere filing of a complaint against a police officer means "ipso facto that he is guilty of a constitutional violation." Id. Moreover, Judge Cogan was unpersuaded by the plaintiffs' argument that the "absence of substantiation as to these incidents" necessarily means that the city "gives no serious consideration to complaints against the police." Id. "[I]t is one thing to assume the facts in this case most favorably to plaintiffs on a summary judgment motion; it is quite another to assume every other unsubstantiated complaint on which they rely in fact entailed a constitutional violation, and

to further assume that this is a representative sample." Id. (emphasis in original).  This Court similarly declines to assume the "absence of substantiation" in the County's IAPro Early Warning Report Summary and the five-year statistical review is evidence of constitutional violations by County officers.

c.   The IAPro System

Plaintiff's allegations regarding the IAPro System are a closer call.  As noted, Plaintiff claims the County customized the IAPro System to avoid triggering warning alerts related to certain police conduct, thus evidencing that County supervisors acquiesced to their officers' abusive conduct.  In response, the County briefly posits that it customized the IAPro System "to make the system optimal for the needs of the Suffolk County Police Department."  (County Reply at 3.)  The County's conclusory and vague argument is hardly reassuring or persuasive.  Certainly, Plaintiff would argue that "optim[izing]" the system to fit the County's "needs" meant modifying the IAPro System parameters to soft pedal the number of early warning alerts regarding reported excessive force claims filed against its officers.  If this were the case, then a reasonable factfinder could infer that the County acquiesced to a pattern of police misconduct.  Such evidence could also support a jury finding that the County was deliberately indifferent to an obvious need for better supervision of its police force.

57

However, there are reasons to doubt this conclusion. As noted, the County's summary judgment submissions fail to address facts relevant to the IAPro System, including the reasons behind the modifications about which Plaintiff complains. And while Plaintiff's response to the County's 56.1 Statement raises the IAPro System modifications, the County did not file a reply, notwithstanding the directive to do so in this Court's Individual Rules. Further, the two depositions transcripts that could clarify the issue, that of Chief Mango and Nancy Zinser, were submitted in excerpted form. (See Exs. G and N, attached to Bennett Decl.) Thus, there are too many gaps in the current record for the Court to determine whether the County can carry its burden on summary judgment.

Nevertheless, Federal Rule of Civil Procedure 56(e)(1) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may give an opportunity to properly support or address the fact." FED. R. CIV. P. 56(e)(1). Thus, the Court finds it prudent to grant the County one final opportunity to adequately address the IAPro System, including the early warning alert parameter modifications, by filing a supplemental 56.1 Statement. Plaintiff may also file a supplemental 56.1 Counterstatement; however, consistent with the Eastern District of New York Local Rules, Plaintiff is advised

that her responses should be "short and concise." Each paragraph in Plaintiff's Counterstatement should respond to the corresponding statement in the County's supplemental 56.1 Statement by admitting or denying the fact with citation to admissible evidence. After responding to each of the County's paragraphs, to the extent necessary, Plaintiff may include additional paragraphs containing separate short and concise statements of additional material facts as to which she contends that there exists a genuine issue to be tried, and the County will be granted the opportunity to respond thereto.

Accordingly, the County's motion for summary judgment is GRANTED as to Plaintiff's <u>Monell</u> claims arising under a (1) widespread <u>de facto</u> policy, and (2) failure-to-supervise/failure-to-discipline theory with respect to the County's Rules and Procedures for reporting substance abuse and the County's response to police misconduct. The Court is deferring ruling on Plaintiff's <u>Monell</u> claims to the extent they are based upon the County's alleged modification of the IAPro System early warning system parameters pending the submission of the parties' supplemental 56.1 Statements in accordance with this Order.

B.    <u>Section 1981, 1985, and 1986 Claims</u>

Next, the Officer Defendants seek summary judgment as to Plaintiff's claims arising under 42 U.S.C. §§ 1981, 1985, 1986.

The four elements of a Section 1985 claim are: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States. Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087–88 (2d Cir. 1993) (citing United Bhd. of Carpenters, Local 610 v. Scott, 463 U.S. 825, 828–29 (1983)); Bailey v. New York L. Sch., No. 19-3473, 2021 WL 5500078, at *4 (2d Cir. Nov. 24, 2021). Further, "the conspiracy must also be motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." Mian, 7. F.3d at 1088 (quoting United Bhd. of Carpenters, Local 610, 463 U.S. at 829); see also Spencer v. Casavilla, 903 F.2d 171, 174 (2d Cir. 1990).

Here, there is no evidence in the record that Turner's race factored into the events surrounding the initial vehicle stop, altercation with the Officer Defendants, or subsequent arrest. Plaintiff does not try to argue to the contrary. (See Pl. Opp'n to Officer Hamilton at 14-15.) Thus, even putting aside whether Plaintiff has demonstrated the existence of a conspiracy, which the Court doubts, Plaintiff's Section 1985 claim fails. See Chance v. Reed, 538 F. Supp. 2d 500, 509 (D. Conn. 2008) (granting summary

judgment on a Section 1985 claim where the plaintiff "offer[ed] no evidence that could show that any of the defendants' actions were motivated in any way by race").

Moreover, the court agrees with the Officer Defendants that the intra-corporate doctrine also bars the Plaintiff's claim. See id. While it is possible for a conspiracy to exist "when the individual defendants are alleged to have been 'motivated by an independent personal stake in achieving the [organization's] objective,'" Plaintiff has produced no evidence of such a situation. Id. (quoting Spector v. Board of Trustees of Community-Technical Colleges, 463 F. Supp. 2d 234, 251 (D. Conn. 2006)).

Accordingly, the Officer Defendants' motion for summary judgment as to Plaintiff's Section 1985 claim is GRANTED. For the same reason, the Officer Defendants' motion for summary judgment as to Plaintiff's claims arising under Section 1981, to the extent the statute even applies here,[15] is GRANTED. Last, because a Section 1986 claim must be predicated upon a valid Section 1985 claim, the Officer Defendants' motion for summary judgment as to Plaintiff's claims arising under Section 1986 is GRANTED. Thomas

---

[15] Section 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." Patterson v. County of Oneida, 375 F.3d 206, 224 (2d Cir. 2004) (emphasis added). The statute has no bearing here. Notwithstanding, the record is bereft of any evidence that shows the Officer Defendants' conduct in this case was motivated by Plaintiff's race.

v. Roach, 165 F.3d 137, 147 (2d Cir. 1999); see also Hollman v. County of Suffolk, No. 06-CV-3589, 2011 WL 2446428, at *11 (E.D.N.Y. June 15, 2011).

### C.    EMTALA

Next, the Court considers the Hospital Defendants' and Plaintiff's cross-motions for summary judgment as to Plaintiff's EMTALA claim.

### 1.    Applicable Law

Congress enacted EMTALA to prevent "patient dumping," or "the practice of refusing to provide emergency medical treatment to patients unable to pay, or transferring them before emergency conditions [are] stabilized." Hardy v. N.Y.C. Health & Hosp. Corp., 164 F.3d 789, 792 (2d Cir. 1999) (quoting Power v. Arlington Hosp. Ass'n, 42 F.3d 851, 856 (4th Cir. 1994)); see also Brooks v. Maryland Gen. Hosp., Inc., 996 F.2d 708, 710 (4th Cir. 1993); Gatewood v. Washington Healthcare Corp., 933 F.2d 1037, 1039 (D.C. Cir. 1991). EMTALA imposes "two primary obligations" on all hospitals that participate in the federal Medicare program. Hardy, 164 F.3d at 792. First, the hospital "must provide for an appropriate medical screening examination within the capability of the hospital's emergency department," to determine whether or not individuals who present for treatment at the hospital's emergency room have an "emergency medical condition." 42 U.S.C. § 1395dd(a) (emphasis added). Second, if the screening examination reveals

the individual has an emergency medical condition, then the hospital must, "within the staff and facilities available at the hospital . . . stabilize the medical condition" before transferring or discharging the patient.  Id. § 1395dd(b)(1)(A) (emphasis added).

The hospital satisfies its obligation to appropriately screen patients by providing "treatment that is equal, as opposed to treatment that meets professional standards of competence." Brenord v. Catholic Med. Ctr. of Brooklyn & Queens, Inc., 133 F. Supp. 2d 179, 185 (E.D.N.Y. 2001) (quoting Fisher v. N.Y. Health & Hosps. Corp., 989 F. Supp. 444, 449 (E.D.N.Y. 1998)); see also Gatewood, 933 F.2d at 1041.  Thus, the focus of the Court's inquiry is on "how the hospital treats other patients who are perceived to have the same medical condition," because "EMTALA is implicated only when individuals who are perceived to have the same medical condition receive disparate treatment."  Fisher, 989 F. Supp. at 449 (citing Vickers v. Nash Gen. Hosp., Inc., 78 F.3d 139, 143 (4th Cir. 1996)).  This is the case "even if the hospital's perception of a particular patient is based on a misdiagnosis," id., since "EMTALA is not a substitute for state law on medical malpractice," and was therefore "not intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence."  Hardy, 164 F.3d at 792 (quoting Power, 42 F.3d at 856).  As a result, "a hospital fulfills the appropriate

screening requirement 'when it conforms in its treatment of a particular patient to its standard screening procedures.'" Brenord, 133 F. Supp. 2d at 185 (quoting Fisher, 989 F. Supp. at 449).

If the screening examination reveals the patient has an emergency medical condition, then the hospital must either (1) "within the staff and facilities available at the hospital, [provide] for such further medical examination and such treatment as may be required to stabilize the medical condition"; or (2) transfer the individual to another medical facility. 42 U.S.C. § 1395dd(b)(1)(A)-(B) (emphasis added). A patient is "'stabilized' when 'no material deterioration of the [emergency medical] condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility . . . ." Perez v. Brookdale Univ. Hosp. & Med. Ctr., 981 F. Supp. 2d 175, 177 (E.D.N.Y. 2013) (quoting 42 U.S.C. § 1395dd(e)(3)(b)). As EMTALA's text makes clear, the stabilization requirement is connected to a possible transfer of the patient and "was intended to regulate the hospital's care of the patient only in the immediate aftermath of the act of admitting her for emergency treatment and while it considered whether it would undertake longer-term full treatment or instead transfer the patient to a hospital that could and would undertake that treatment." Cooper v. City of New York, No. 14-CV-3698, 2016 WL

4491719, at *4 (E.D.N.Y. Aug. 25, 2016) (quoting Bryan v. Rectors and Visitors of Univ. of Va., 95 F.3d 349, 352 (4th Cir. 1996)). Thus, EMTALA's stabilization requirement does not require the hospital "to alleviate completely [the plaintiff's] emergency condition." Brooker v. Desert Hosp. Corp., 947 F.2d 412, 415 (9th Cir. 1991).

In the event the hospital transfers the patient without having stabilized his emergency medical condition, the statute imposes additional requirements. As relevant here, the transferring physician must sign a certification that, "based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual . . . from effecting the transfer." 42 U.S.C. § 1395dd(c)(1)(A)(ii). Further, the transfer must be "appropriate," that is, (1) the transferring hospital must provide medical treatment, "within its capacity," that minimizes the risks of the individual's health; (2) the receiving facility must have (a) available space and qualified personnel for the treatment of the individual and (b) agreed to accept transfer of the individual and provide appropriate medical treatment; (3) the transferring hospital must send to the receiving facility all medical records available at the time of transfer related to the patient's emergency condition; (4) the transfer must be effected

through qualified personnel and transportation equipment; and (5) must be done in accordance with any other requirements imposed by the Secretary of Health and Human Services (the "Secretary"). Id. § 1395dd(c)(2)(A)-(E).

EMTALA authorizes the Secretary to proceed against both hospitals and physicians for violations of EMTALA, id. § 1395dd(d)(1), and supplies a private right of action against hospitals, provided the patient establishes he "suffer[ed] personal harm as a direct result of a participating hospital's violation," id. § 1395dd(d)(2)(A).

 2. Application

  i. The Screening Obligation

First, the record demonstrates as a matter of law that the Hospital Defendants appropriately screened Turner. It is undisputed that Dr. MacLeod and Nurse Matutino examined Turner using standard forms -- the Emergency Physician Record and the Emergency Department Nursing Assessment, respectively -- that Brookhaven Hospital personnel would have used to assess any patient who presented to the emergency room as a victim of an alleged assault. In short, the screening examination employed by the Hospital Defendants to screen Turner conformed to Brookhaven Hospital's standard screening procedures. Brenord, 133 F. Supp. 2d at 187 (at summary judgment stage, finding the hospital defendants complied with EMTALA's duty to provide appropriate

medical screening by screening the plaintiff, a pregnant woman, in accordance with the hospital's standard procedure for screening pregnant women); Fisher, 989 F. Supp. at 449-50 (finding summary judgment appropriate on EMTALA's screening duty in the absence of any evidence of disparate treatment).

Plaintiff advances one theory of disparate screening, arguing that Turner "was not treated like any other assault victim," because Dr. MacLeod ordered sedatives be administered to Turner so Turner could safely undergo the CT scan. (Pl. Opp'n to Hosp. Defs. at 14.) Plaintiff disputes whether the sedatives were truly administered for Turner's safety -- yet does not address whether the safety of hospital staff was a consideration -- and points out that "sedation is actually contraindicated in the setting of a potential brain injury as it renders the staff unable to assess the patient's neurological status." (Id.)[16] But Plaintiff fails to support this theory with any evidence in the record that shows similar patients, i.e., combative patients presenting with potential brain injuries, would not be sedated in order to ensure they safely undergo CT scans. Thus, there is nothing in the record from which a jury could infer that the

---

[16] Plaintiff cites generally, without specification, to the Shields Report (Ex. NN, attached to Bennett Decl.) in support of this proposition. Having independently reviewed the Shields Report, however, the Court is unable to identify where within the Shields Report Plaintiff draws such support.

Hospital Defendants treated Turner differently from any other similarly situated patient.  Compare Brenord, 133 F. Supp. 2d at 186-90, and Fisher, 989 F. Supp. at 449-50; with Power, 42 F.3d at 856 (upholding jury verdict in the plaintiff's favor on her EMTALA claim for failure to provide an appropriate screening where the plaintiff "presented evidence from which a jury could conclude that she was treated differently from other patients presenting to [the hospital's] emergency room, and that the [h]ospital did not apply its standard screening procedure, such that it was, uniformly").

Plaintiff's remaining arguments as to the screening requirements ask this Court to do precisely what countless district and circuit courts throughout the country have found EMTALA was not intended to do: "displace" or "supplant" state malpractice law by incorporating a malpractice or negligence standard into EMTALA. Hardy, 164 F.3d at 792; Owens v. Bellevue Hosp. Ctr., 101 F.3d 109 (2d Cir. 1996); Gatewood, 933 F.2d at 1041; Brooks, 996 F.2d at 714-15.  Relying on an expert report from Dr. Lawrence W. Shields (the "Shields Report"),[17] Plaintiff advances several arguments that all sound in malpractice.  For example, Plaintiff argues that Dr. MacLeod, after having ordered the CT scan that led to an accurate diagnosis of Turner's emergency subdural hematoma medical

---

[17] (Ex. NN, attached to Bennett Decl.)

condition, should have ordered Mannitol to relieve intracranial pressure. (Pl. Opp'n to Hosp. Defs. at 15.) But EMTALA does not require the Court to determine whether the Hospital Defendants provided treatment that met professional standards of competence. See Brenord, 133 F. Supp. 2d at 188-89 (rejecting similar arguments for EMTALA liability premised on the "proper medical screening examination" advanced by the plaintiff's expert). For that reason, the "deviations from the standards of medical care" raised in the Shields Report, such as "failing to timely diagnose Mr. Turner's condition" or "failing to timely proffer indicated treatment for said condition," will not sustain a claim under EMTALA. (Shields Report at 30.) "In short, the only respect in which the screening examination is said to be non-uniform is nothing more than an accusation of negligence." Fisher, 989 F. Supp. at 489. Based on the absence of any evidence of disparate treatment, summary judgment is appropriate on the screening question.

### ii    The Stabilization Obligation

Second, the record demonstrates as a matter of law that the Hospital Defendants stabilized Turner's emergency medical condition. The undisputed record makes plain that Turner was stabilized within the meaning of EMTALA, because his emergency medical condition was not likely to, and in fact did not, deteriorate as a result of his transfer. Perez, 981 F. Supp. 2d at 177.

Arguing to the contrary, Plaintiff contends "[Brookhaven Hospital staff] and Dr. MacLeod were required to stabilize Mr. Turner's subdural hematoma prior to transferring him to [Stony Brook University Hospital]." (Pl. Opp'n to Hosp. Defs. at 19.) In support of this argument, Plaintiff points to the following pieces of evidence: (1) Dr. MacLeod's deposition testimony, in which she conceded that when she certified Turner's condition was stable for transfer, she was not referring to his subdural hematoma condition, which she could not stabilize; and (2) the Galler Report, wherein Dr. Galler stated that Brookhaven Hospital's on-call neurosurgeon, Dr. Sheth, "did not respond appropriately" to Dr. MacLeod's call for a neurosurgical evaluation, thus violating "traditional call scheduling and EMTALA."

Plaintiff's arguments ignore EMTALA's text. To begin, EMTALA's screening and stabilization requirements embody a contextual approach that acknowledges the hospital's capabilities and resources. See Cherukuri v. Shalala, 175 F.3d 446, 454 (6th Cir. 1999) ("The statutory definition of 'stabilize' requires a flexible standard of reasonableness that depends on the circumstances."); see also id. at 451 ("'[A] hospital is charged only with the responsibility of providing an adequate first response to a medical crisis' which 'means the patient must be evaluated and, at a minimum, provided with whatever medical support services and/or transfer arrangements that are consistent with the

70

capability of the institution and the well-being of the patient."
(first emphasis in original; second emphasis added) (quoting 131
Cong. Rec. 28569 (1985) (statement of Senator Bob Dole, a co-
sponsor of EMTALA)).) As noted, the screening requirement
obligates the hospital to "provide for an appropriate medical
screening examination within the capability of the hospital's
emergency department." Further, the stabilization requirement
obligates the hospital to stabilize the patient's emergency
medical condition "within the staff and facilities available at
the hospital." As a result, stability must be defined in reference
to the hospital's capabilities. Cf. Kime v. Adventist Health
Clearlake Hosp., Inc., 254 F. Supp. 3d 1071, 1077 (N.D. Cal. 2017)
(observing in the context of EMTALA retaliation claim that "EMTALA
specifically ties a hospital's screening obligations to the
emergency department's capabilities"). Indeed, "EMTALA's
definition of stability does not share the same meaning as the
medical term 'stable condition,' which 'indicates that a patient's
disease process has not changed precipitously or significantly.'"
St. Anthony Hosp. v. U.S. Dep't of Health & Hum. Servs., 309 F.3d
680, 694 (10th Cir. 2002) (quoting medical dictionaries). Thus,
under EMTALA, "[a] patient may be in a critical condition . . . and
still be 'stabilized' under the terms of the Act." Id. (quoting
Brooker, 947 F.2d at 415).

Here, it is undisputed that the only treatment that would have alleviated Turner's subdural hematoma was neurosurgical intervention, a procedure that, "within the staff and facilities available" in the evening hours of April 6, 2010, Brookhaven Hospital staff could not perform. Accordingly, Dr. MacLeod and Brookhaven Hospital staff stabilized Turner's medical condition for the purposes of transfer and consistent with the staff's capabilities. See Cooper, 2016 WL 4491719, at *4. Prior to transfer, the Hospital Defendants monitored Turner closely, administered medicine to him, took his vitals, intubated him, and reviewed an x-ray to determine whether his lungs had collapsed. Thus, the case is factually similar to Brooker, where the hospital defendants transferred the patient-plaintiff because they were unable to perform the necessary double coronary bypass graft surgery, but not before performing such treatment as the staff's capabilities permitted. 947 F.2d at 413-14. Affirming the district court's order granting judgment to the hospital defendants, the Ninth Circuit reasoned EMTALA "did not require [the hospital defendants] to alleviate completely [the patient-plaintiff's] emergency condition." Id. at 415. Similarly, here, the Hospital Defendants were not obligated to alleviate completely Turner's subdural hematoma, which they could not "within the staff and facilities available," to satisfy EMTALA's stabilization obligation.

The Galler Report, wherein Dr. Galler claims that the Hospital Defendants violated EMTALA, does not change the Court's conclusion. In response to questioning at his deposition about the basis for this statement, Dr. Galler disclaimed legal expertise with respect to EMTALA (Dr. Galler Depo. Tr. at 61:18, Ex. 24) and admitted that his statement was based on several groundless assumptions (id. at 103-08). For example, while Dr. Galler stated that "the fact that someone was on call and was unavailable seemed wrong" (id. at 60:23-24), he later admitted that he had "no direct knowledge of how [the on-call neurosurgeon] did or did not respond," including the "underlying circumstances" that caused Dr. Sheth to be unavailable (id. at 105:5-21). At most the Galler Report could support a medical malpractice claim for delay or failure to treat, not an EMTALA claim. Indeed, to the extent Plaintiff's EMTALA claims are premised on inadequate staffing, it would fall under state medical malpractice or negligence law, not EMTALA. Cf. Zellar v. Tompkins Cmty. Hosp., Inc., 124 A.D.2d 287, 288 (N.Y. App. Div. 3d Dep't 1986).[18]

---

[18] EMTALA does authorize the government to seek civil monetary penalties from hospitals or physicians who fail to comply with staffing requirements for on-call physicians. 42 U.S.C. § 1395dd(d)(1)(A)-(C). However, as the Hospital Defendants correctly point out (Hosp. Defs. Support Memo at 22), these provisions are separate from the provisions that authorize private causes of action, and the two should not be conflated. See Verhagen v. Olarte, No. 89-CV-0300, 1989 WL 146265, at *6 (S.D.N.Y. Nov. 21, 1989) (observing "the civil enforcement provisions differ from those for civil monetary penalties"); see also John Hancock

Even assuming _arguendo_ that the Hospital Defendants were obligated to stabilize Turner's subdural hematoma prior to transfer, the Court also finds that the transfer of Turner to Stony Brook University Hospital was appropriate under EMTALA. The transfer was "appropriate" within the meaning of EMTALA because Brookhaven Hospital met each of the delineated requirements set forth _supra_. It is undisputed that (1) prior to transfer, the Hospital Defendants provided medical treatment, "_within its capacity_," that minimized risks to Turner's health; (2) Stony Brook University Hospital had available space for the transfer and qualified personnel to provide Turner the neurological treatment he needed and agreed to accept transfer as a result; (3) all of Turner's medical records available at the time of transfer relating to Turner's emergency condition were provided by Brookhaven Hospital to Stony Brook University Hospital (Hosp. Defs. 56.1 Stmt. ¶ 132); and (4) the transfer was effectuated by qualified personnel, the Stony Brook University Hospital Transport Team, who had the appropriate transportation equipment. Further, the medical benefits reasonably expected from the provision of neurological intervention at Stony Brook University Hospital

---

Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank, 510 U.S. 86, 94–95 (1993) (interpreting statute "not by 'a single sentence or member of a sentence, but look[ing] to the provisions of the whole law, and to its object and policy.'" (quoting Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 51 (1987))).

outweighed the risks to Turner from effecting the transfer.  In fact, according to the record, Turner "remained without change throughout [the] transport" with "[n]o change in [his] neuro status."  See Cherukuri, 175 F.3d at 453 (finding stabilization requirement met where all witnesses agreed that the patients arrived at the transferee hospital "without further injury or deterioration, that their blood pressure and breathing remained stable and did not deteriorate, and that the travel did not further exacerbate the patients' conditions").

It is true that, in the event an emergency medical condition has not been stabilized and the hospital seeks to transfer the patient, EMTALA requires the transferring physician, Dr. MacLeod here, to sign a certification to that effect.  This did not happen here; rather, Dr. MacLeod certified that Turner was stable for transfer.  Nevertheless, under EMTALA the plaintiff must establish that he "suffer[ed] personal harm as a direct result of the participating hospital's violation."  42 U.S.C. § 1395dd(d)(2)(A).  In the present action, even if the Court were to find that the Hospital Defendants did not stabilize Turner's condition and were therefore required to comply with EMTALA's transfer requirements, it cannot be said that Turner suffered direct personal harm due to Dr. MacLeod's failure to sign the certification, especially considering it is undisputed that his

condition did not deteriorate during his transfer to Stony Brook University Hospital.

Last, to the extent argued, Plaintiff cannot pursue his EMTALA claim against individual physicians like Dr. MacLeod. Brenord, 133 F. Supp. 2d at 186 (collecting cases).

Accordingly, the Hospital Defendants' motion for summary judgment as to Plaintiff's EMTALA claims is GRANTED and Plaintiff's cross-motion is DENIED.

D.    New York State Law Claims

The Court now turns to Plaintiff's New York State law claims against the Officer Defendants and the Hospital Defendants.

First, the Officer Defendants' motion for summary judgment on Plaintiff's battery and wrongful death claims is DENIED. Est. of Jaquez, 104 F. Supp. 3d at 439 ("Because there is a genuine issue of material fact as to whether [the officer] used excessive force against [the plaintiff], there is likewise a genuine issue of material fact as to whether [the officer] committed assault against [the plaintiff], and the motion for summary judgment is thus denied with respect to the assault claim." (quoting Pierre-Antoine v. City of New York, No. 04-CV-6987, 2006 WL 1292076, at *8 (S.D.N.Y. May 9, 2006))); id. (same for wrongful death).)

Second, the Officer Defendants' motion for summary judgment on Plaintiff's negligence claim is GRANTED. "When a

plaintiff asserts excessive force and assault claims which are premised upon a defendant's allegedly intentional conduct, a negligence claim with respect to the same conduct will not lie." Dineen v. Stramka, 228 F. Supp. 2d 447, 454 (S.D.N.Y. 2002) (citing Mazurkiewicz v. N.Y.C. Transit Auth., 810 F. Supp. 563, 570-71 (S.D.N.Y. 1993) (holding that "[p]laintiff cannot argue that defendants engaged in intentional conduct that forms the basis of an assault and § 1983 excessive force claim and also argue that defendants were negligent towards plaintiff")); Universal Calvary Church v. City of New York, No. 96-CV-4606, 2000 WL 1745048, at *12 (S.D.N.Y. Nov. 28, 2000). Here, Plaintiff asserts claims premised upon allegedly intentional conduct, including his Section 1983 excessive force claim and New York State law claim for battery, and it is undisputed that the Officer Defendants intentionally used force against Turner. Accordingly, Plaintiff cannot proceed to trial on a negligence theory of liability.

Last, having granted summary judgment on the sole federal claim asserted against the Hospital Defendants, the EMTALA claim, the Hospital Defendants ask the Court to decline to exercise supplemental jurisdiction over Plaintiff's wrongful death and negligence claims. (Hosp. Defs. Support Memo at 24.) However, the Second Circuit has held that "a district court may not decline to exercise supplemental jurisdiction over state law claims where federal claims remain against other defendants and the state law

claims 'form part of the same case or controversy.'"  Anderson v. City of Mount Vernon, No. 09-CV-7082, 2018 WL 557903, at *2 (S.D.N.Y. Jan. 23, 2018) (quoting Mejia v. Davis, No. 16-CV-9706, 2018 WL 333829, at *7 (S.D.N.Y. Jan. 8, 2018)); see also Briarpatch Ltd. v. Phoenix Pictures, Inc., 373 F.3d 296, 308 (2d Cir. 2004); Ciambriello v. County of Nassau, 292 F.3d 307, 325 (2d Cir. 2002). Accordingly, at this stage of the case, since there are federal claims against the other Defendants, and the Hospital Defendants put forth no argument that Plaintiff's remaining claims against them do not form part of the same case or controversy as Plaintiff's remaining federal claims against the Officer Defendants, the Court must exercise supplemental jurisdiction over these state law claims.

E.    Remaining Claims and Defendants

In addition to the claims set forth above against the Officer and Hospital Defendants, Plaintiff also maintains claims against certain John Doe Defendants and the Suffolk County Police Department.  First, Plaintiff's claims against the John Doe Defendants must be dismissed for failure to prosecute, because discovery has been closed for quite some time and Plaintiff has had ample opportunity to identify and serve the John Doe Defendants, both of which she has failed to do.  Asseng v. County of Nassau, No. 14-CV-5275, 2021 WL 5966290, at *11 (E.D.N.Y. Dec. 16, 2021) (quoting Delrosario v. City of New York, No. 07-CV-2027,

2010 WL 882990, at *5 (S.D.N.Y. Mar 4, 2010)).  Second, to the extent pursued, it is well settled Plaintiff cannot maintain claims against the Suffolk County Police Department, because the Department is an administrative arm that does not have a legal identity separate and distinct from the County.  Anderson v. Incorporated Village of Hempstead, No. 15-CV-1485, 2022 WL 267875, at *5 n.4 (E.D.N.Y. Jan. 28, 2022).  Accordingly, Plaintiff's claims against the remaining John Doe Defendants and the Suffolk County Police Department are DISMISSED.

## CONCLUSION

Thus, for the foregoing reasons, **IT IS ORDERED** that:

1) The Officer Defendants' respective motions for summary judgment (ECF Nos. 99, 100) are:

   a) DENIED with respect to Plaintiff's Section 1983 claim for excessive force, and Plaintiff's New York State law claims for battery and wrongful death; and

   b) GRANTED with respect to Plaintiff's Section 1983 claims for false arrest and abuse of process, Section 1981, 1985, and 1986 claims, and Plaintiff's New York State law claim for negligence;

2) The County's motion for summary judgment (ECF No. 104) as to Plaintiff's Monell claims is GRANTED; except that:

a)    Within thirty days from the date of this Memorandum & Order, the County shall file and serve a supplemental 56.1 Statement regarding the IAPro System to address facts relevant to Plaintiff's <u>Monell</u> claim based on the County's alleged modification of the early warning system parameters;

b)    Within thirty days of receipt of the County's supplemental 56.1 Statement, Plaintiff shall file and serve a supplemental 56.1 Counterstatement;

c)    Within fifteen days of receipt of Plaintiff's supplemental 56.1 Counterstatement, the County shall file and serve its response, if any;

d)    Consistent with the Eastern District of New York Local Rules, the parties are advised that their statements and responses should be "short and concise"; and

e)    Once the supplemental 56.1 Statements and Counterstatements are filed, the Court will determine whether further briefing is necessary;

3)    Plaintiff's cross-motion for summary judgment as to her <u>Monell</u> liability claim (ECF No. 111) is DENIED;

4)    The Hospital Defendants' motion for summary judgment (ECF No. 103) as to Plaintiff's EMTALA claim is GRANTED;

however, the Court RETAINS supplemental jurisdiction over Plaintiff's remaining state law claims against the Hospital Defendants for wrongful death and negligence;

5)    Plaintiff's cross-motion for summary judgment as to her EMTALA claim (ECF No. 118) is DENIED;

6)    Plaintiff's claims against the John Doe Defendants and the Suffolk County Police Department are <u>sua sponte</u> DISMISSED; and

**IT IS FURTHER ORDERED** that the parties shall use the following caption in all future filings:

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
TAWANA SCOTT, individually and as
Administratrix of the Estate of
KEVIN TURNER

                    Plaintiff,

        -against-                    12-CV-0909(JS)(SIL)

COUNTY OF SUFFOLK; SUFFOLK COUNTY
POLICE OFFICERS JASON LaROSA and
KENNETH HAMILTON; BROOKHAVEN
MEMORIAL HOSPITAL; and MARGARET L.
MACLEOD, M.D.,

                    Defendants.
------------------------------------X

**IT IS FURTHER ORDERED** that, within sixty days from the date of this Memorandum & Order, the parties shall submit for Court approval a joint pre-trial order consistent with this Court's Individual Rules; and

**IT IS FURTHER ORDERED** that, because this Memorandum & Order contains information submitted under seal, **the Clerk of the Court shall temporarily restrict access to this Memorandum & Order to case participants only** pending the parties' compliance with the accompanying Order to Show Cause and the Court's resolution of the issues raised therein.


                              **SO ORDERED.**


                              /s/ JOANNA SEYBERT
                              Joanna Seybert, U.S.D.J.


Dated:     March  22 , 2022
           Central Islip, New York